# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00867-SCT

*DWIGHT L. HASTINGS*

*v.*

*WALTER L. GUILLOT, III*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/10/2001 |
| TRIAL JUDGE: | HON. FRANKLIN C. McKENZIE, JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID M. RATCLIFF |
| ATTORNEY FOR APPELLEE: | DEIDRA J. BASSI |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/29/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/19/2002 |

**BEFORE SMITH, P.J., CARLSON AND GRAVES, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. Dr. Dwight L. Hastings appeals from a chancery court order enforcing a settlement agreement resolving his litigation against Dr. Walter L. Guillot, III, arising from the sale of Hastings's dental practice to Guillot. Finding no reversible error, we affirm.

## FACTS AND PROCEEDINGS BELOW

¶2. This is an appeal from Jones County Chancery Court from an order to enforce a settlement involving the sale of a dental practice from Dr. Dwight L. Hastings (Hastings) to Dr. Walter L. Guillot, III (Guillot). Hastings filed a complaint for breach of contract on August 19, 1999, alleging that Guillot had failed to make payments pursuant to the terms of the sale. Hastings sued to recover $59,180.44, the amount remaining on the note. Guillot answered the complaint on September 3, 1999, and counterclaimed, arguing that Hastings "intentionally and fraudulently misrepresented and/or concealed and/or omitted material information relating to the financial data and net worth of the practice."

¶3. On February 25, 1993, Hastings and Guillot entered into an Asset Purchase Agreement in which Hastings agreed to sell his Laurel dental practice to Guillot. Included in the agreement were equipment and various other dental office wares, as well as the transfer of Hastings's patient files to Guillot. The purchase price of the entire transaction was $111,890.00, with $22,378.00 paid in cash at closing. Hastings financed the balance of the transaction (evidenced by a promissory note) totaling $89,512.00, which was to be paid

in monthly installments over the course of the following ten years.

¶4. Hastings filed suit on August 19, 1999, alleging that Guillot had failed to make payments on the promissory note since May 1998 and claimed the entire balance was due. Guillot answered and counterclaimed, stating that he had discovered improprieties in Hastings's billing practices which directly affected the financial value of the practice and constituted fraud and misrepresentation. It was after he discovered these problems that he ceased making payments. Guillot sought cancellation or recission of the contract and damages.

¶5. On November 6, 1999, the depositions of Hastings and Guillot were scheduled to take place. Guillot's deposition was finished that morning. A break for lunch was taken shortly after Hastings's deposition had begun, and settlement negotiations were initiated. An offer was made by Guillot to Hastings. Counsel for Hastings, made a counter-offer. Guillot made a second offer, which, Guillot alleges, Hastings accepted. The court reporter was released from service.

¶6. On November 10, 1999, counsel for Guillot sent a "Mutual Release and Settlement Agreement" to counsel for Hastings. Counsel for Guillot received a phone call on November 22, 1999, advising counsel for Hastings had been fired and that Hastings now refused the settlement.

¶7. Counsel for Guillot filed a Motion to Enforce Settlement on November 24, 1999. New counsel entered an appearance as counsel for Hastings on December 15, 1999. A hearing was held on the Motion to Enforce Settlement on January 19, 2000. Having filed no prior affidavits to refute the settlement, Hastings filed such an affidavit on February 2, 2000.

¶8. The trial court ordered the case to mediation on July 12, 2000. An objection to mediation was filed by Hastings on July 17, 2000, which was withdrawn on September 8, 2000. The parties agreed to set the matter for trial on June 19, 2001.

¶9. After a hearing on May 8, 2001, the trial court entered an order granting Guillot's Motion to Enforce Settlement. The court then entered a final order enforcing the settlement and dismissing the case. The order provided for the dismissal of the action, a payment of $10,000 by Hastings to Guillot, Guillot's return of patient records to Hastings, and the cancellation of the security agreements between Guillot and Hastings. This appeal followed.

## STANDARD OF REVIEW

¶10. This Court will not disturb the findings of a chancellor unless it is shown the chancellor was clearly erroneous and the chancellor abused his discretion. *Hill v. Southeastern Floor Covering Co.,* 596 So.2d 874, 877 (Miss. 1992), *Bell v. Parker*, 563 So. 2d 594, 597 (Miss. 1990).

## DISCUSSION

¶11. At issue in this appeal is whether the chancellor abused his discretion in granting an order enforcing the settlement agreement. In order to answer that question, we must ask if there was indeed a binding settlement.

### I. WAS THERE A MEETING OF THE MINDS?

¶12. In his brief, the Hastings cites *Viverette v. State Highway Comm'n*, 656 So. 2d 102 (Miss. 1995). *Viverette* provides guidance on where to begin this inquiry. As we wrote in *Viverette*, in order for there to be a settlement there must be a meeting of the minds. *Thomas v. Bailey*, 375 So. 2d 1049, 1052 (Miss. 1979) (citing *Hutton v. Hutton*, 239 Miss. 217, 230, 119 So. 2d 369, 374 (1960)). A settlement is a contract. *McManus v. Howard*, 569 So. 2d 1213, 1215 (Miss. 1990). Also, Mississippi law requires the party claiming benefit from the settlement must prove by a preponderance of the evidence that there was a meeting of the minds. *Warwick v. Matheney*, 603 So.2d 330, 336 (Miss. 1992).

¶13. In *Viverette*, we found that there was insufficient evidence of a meeting of the minds and reversed an order of the trial court enforcing the settlement. We so found because there was distinct confusion as to what the final settlement was. Additionally, one of the witnesses to the proposed settlement was a convicted perjurer, and his testimony was rightly excluded by the trial court. If there were any confusion as to the proposed settlement in the case sub judice, it is not evidenced in the record, nor was there exclusion of testimony of either parties because of perjury convictions. We find the *Viverette* case a satisfactory statement of the law, but not factually analogous to the case sub judice.

¶14. Guillot contends that the only evidence Hastings presented refuting the suggestion that there was a meeting of the minds was his affidavit of February 2, 2000. This appears in the record to be the case, and that affidavit does very little other than deny there was any meeting of the minds. All that the law requires is that Guillot, the beneficiary of the settlement, show, by a preponderance of the evidence, that there was a meeting of the minds. We find this has been achieved.

¶15. The record includes testimony from Guillot's attorneys regarding the day of the deposition and settlement negotiations. Hastings's former attorney refused to testify as to what transpired during the depositions and settlement negotiations, due to the fact that, according to him, Hastings had threatened to sue him if he did.

¶16. Perhaps the most compelling evidence that a meeting of the minds had been achieved was the release of the court reporter before the scheduled depositions were concluded. Afterwards, a release and settlement statement were prepared and sent to counsel for Hastings. Had there been no meeting of the minds, there would have been no such documentation prepared. Without a meeting of the minds, the attorneys would have proceeded with the case, not prepared settlement documents. Even though there was no discussion about the settlement being contingent on it being reduced to writing, it appears this was simply the next logical step after a settlement agreement had been reached.

¶17. Accordingly, we find there was a meeting of the minds and Guillot proved by a preponderance of the evidence that such occurred.

### II. DID THE CHANCELLOR ABUSE HIS DISCRETION BY VOIDING A PORTION OF THE "MUTUAL RELEASE AND SETTLEMENT AGREEMENT" AS AGAINST PUBLIC POLICY AND ENFORCING THE REMAINDER?

¶18. Hastings argues that the settlement is void because the chancellor abused his discretion by voiding a part of the settlement and enforcing the other.

¶19. In the second numbered paragraph of the trial court's final judgment, the chancellor voided a portion of the agreement: "The Court further finds that any agreement by Dr. Walter Guillot regarding reporting any

actions taken by Dr. Hastings is against public policy and shall not be considered a part of settlement." Basically, part of the proposed settlement included an agreement that Guillot would not report any of Hastings's actions to the State Dental Board.

¶20. We do not find Hastings's arguments responsive to this issue. In his brief, Hastings states that in order to establish a contract, there need be an offer, acceptance, and consideration. *See Gatlin v. Methodist Med. Ctr., Inc.*, 772 So. 2d 1023, 1029 (fn3) (Miss. 2000). Hastings argues what is required to establish a contract and then argues that the facts in the case sub judice reveal that no contract was established. His argument does not address the issue of public policy. Finding no case law to the contrary, and recognizing it is well within the chancellor's authority to void parts of a contract as violative of public policy, we find nothing rising to the level of abuse of discretion in the chancellor's actions in this regard.

¶21. A review of the record reveals that the chancellor noted it would be good public policy not to enforce this portion of the agreement because "we need people who will come forward and report wrong doing if it occurs." Certainly, the trial court was more than justified in finding that it was contrary to public policy to enforce this term of the settlement by keeping improprieties quiet.

¶22. Hastings further argues that by the chancellor's removal of this portion of the contract, he has removed the only beneficial aspect of the agreement for Hastings: that he would not be reported to the State Dental Board. To argue that the only benefit to Hastings is to avoid defending himself from possible criminal prosecution as well as loss of a dental license is not a valid argument. Moreover, Hastings benefits from having all claims Guillot may file in the future settled.

¶23. Accordingly, the trial court did not err in finding that there was indeed an offer, acceptance, and consideration.

### III. MISSISSIPPI LAW REGARDING SETTLEMENTS

¶24. The law favors the settlement of disputes by agreement of the parties and, ordinarily, will enforce the agreement which the parties have made, absent any fraud, mistake, or overreaching. *First Nat'l Bank v. Caruthers*, 443 So.2d 861, 864 (Miss. 1983); *Weatherford v. Martin*, 418 So.2d 777, 778 (Miss. 1982).

¶25. It is well-settled that "where conflicting testimony is presented, expert and otherwise, the chancellor is required to make a judgment on the credibility of the witnesses in order to resolve the questions before the court." *Broadhead v. Bonita Lakes Mall, Ltd. P'ship*, 702 So.2d 92, 101 (Miss. 1997); *Doe v. Doe*, 644 So. 2d 1199, 1207 (Miss. 1994).

¶26. The record in the case does not reveal anything approaching "fraud, mistake, or overreaching" as the law requires. Moreover, the chancellor was in the best position to decide that issue, as well as the credibility of the witnesses. We see nothing besides the affidavit of Hastings (which merely says there was no settlement), which refutes that there was a settlement. The testimony of Guillot's attorneys as well as the affidavits they submitted give specific instances of what happened on the day of the settlement. Hastings's affidavit merely denies ever having agreed to settle. The evidence shows a settlement was achieved.

¶27. While there may be what appears to be disputed testimony in the record as to whether there was a settlement agreement, the testimony and affidavits submitted by Guillot are far more specific than the general denial offered by Hastings. Moreover, the court reporter was sent home and wrote a letter to that effect.

After the deposition and the agreement on the settlement, Guillot's counsel prepared the settlement documents. Certainly, from the record before us, the trial court was well justified in its findings.

## CONCLUSION

¶28. The chancellor did not abuse his discretion in enforcing the settlement between Guillot and Hastings. Guillot met his burden of proving a meeting of the minds by a preponderance of the evidence and the settlement was not the product of fraud, mistake, or overreaching. Mississippi law favors settlement where legitimately achieved. Therefore, the judgment is affirmed.

¶29. **AFFIRMED.**

> **PITTMAN, C.J., SMITH, P.J., WALLER, DIAZ AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J.**
>
> **COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶30. I concur with the majority's determination that Hastings initially consented to the settlement. However, I write separately to dissent from the portion of the majority's opinion which holds that public policy justified the chancellor's voiding of the provision in the contract that prohibited Guillot from initiating any action against Hastings by a third party. The chancellor's stated justification for doing so was that "we need people who will come forward and report wrong doing if it occurs." The majority finds that this reason "more than justifie[s] . . . finding that it was contrary to public policy to enforce this term of the settlement by keeping improprieties quiet."

¶31. Although I agree with the chancellor's good intentions, I believe that his method of correcting a perceived wrong is improper. This ad hoc creation of a public policy in this instance is an abuse of discretion, because for nearly a hundred years--since *Orrell v. Bay Manufacturing Co.*--this Court has recognized only a narrow scope for the exercise of this "far reaching and easily abused" power to rewrite contracts on the grounds of public policy. *Cappaert v. Junker*, 413 So. 2d 378, 380 (Miss. 1982) (quoting *State ex rel. Knox v. Edward Hines Lumber Co.*, 150 Miss. 1, 115 So. 598 (1928)); *see Orrell*, 83 Miss. 800, 824, 36 So. 561, 564 (1904); *accord*, *Heritage Cablevision v. New Albany Elec. Power Sys.*, 646 So. 2d 1305, 1313 (Miss. 1994). "[W]e have held that this should not be done unless the contract is prohibited by the Constitution, a statute, or condemned by some decision of the courts construing the subject matter." *Id.* (quoting *Cappaert*, 413 So. 2d at 380); *see also* *Jackson v. Sam Finley, Inc.*, 366 F.2d 148, 154 (5th Cir. 1966) (recognizing "restrictive view" taken by *Orrell* and its progeny), *cited in* *Simons v. City of Columbus*, 593 F. Supp. 876, 880-81 (N.D. Miss. 1984), *aff'd mem.* 805 F.2d 1031 (5th Cir. 1986).

¶32. Rather than relying on any such authority, the chancellor chose to exercise his discretion in creating such an exception, contrary to *Cappaert*'s holding. There was no showing that Guillot was under any legal duty to report any perceived improprieties that might be suggested by Hastings's records. Nor was there any proof of criminal behavior by Hastings that Guillot was binding himself not to report. If that were the case, there is some authority to hold such a promise to be unenforceable. *See, e.g., Baker v. Citizens Bank*, 208 So. 2d 601, 606 (Ala. 1968).

¶33. Because the trial court's legal authority to void a contract on public policy grounds is strictly limited, the

failure to remain within the bounds set by *Cappaert* and its predecessors is an abuse of discretion. *Cf.* *City of Madison v. Bryan*, 763 So. 2d 162, 168 (Miss. 2000) (failure to cite proper authority for imposition of sanctions is an abuse of discretion). The majority's statement that it finds no authority *contrary to* the chancellor's exercise of power is inapposite, because our precedents clearly require that the power to void contracts in the name of public policy requires positive precedent. *Cappaert* cannot be read as allowing judges to void contracts as they wish, so long as no precedent specifically prevents them from doing so.

¶34. While the majority may well be correct that a contractual provision such as that in question here *should* be void as against public policy, it is for the Legislature to set the public policy in this regard. Miss. Const. art. 7, § 198 ("The legislature shall enact laws to prevent all . . . contracts . . . inimical to the public welfare.").

**EASLEY, J., JOINS THIS OPINION.**