# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-01245-SCT

*EDWIN WELSH*

*v.*

*WILLIAM M. MOUNGER, II, E. B. MARTIN, JR.,*
*MSM, INC. AND MERCURY WIRELESS*
*MANAGEMENT, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/27/2002 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | GRADY F. TOLLISON, JR. |
| | E. FARISH PERCY |
| | JOHN LEONARD WALKER |
| | PHILLIP J. BROOKINS |
| | DANA E. KELLY |
| | JAMES R. HUBBARD |
| ATTORNEYS FOR APPELLEES: | PAUL STEPHENSON, III |
| | GEORGE R. FAIR |
| | JOHN L. MAXEY, II |
| | DONNA ROSS PHILIP |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 07/01/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This appeal arises from a settlement agreement entered into by appellant Edwin Welsh and William H. Mounger II, E.B. Martin Jr., MSM, Inc. (MSM), Mercury Wireless Management, Inc. (MWM); and others in a civil action filed in the Hinds County Chancery

Court in 1997. As that matter was nearing trial in the fall of 1999, the parties and their attorneys executed an Absolute Release with Covenants memorializing a settlement of Welsh's stock ownership claims. Upon joint motion of the parties, the chancery court entered an order of dismissal with prejudice.

¶2. The present action was filed by Welsh in August of 2000,[1] alleging that the settlement was procured by fraud. After testimony from more than twenty witnesses during eleven days of trial, the Hinds County Chancery Court found in favor of Mounger and Martin. Welsh now appeals. Finding no error, we affirm.

## FACTS

¶3. Welsh, Mounger, Martin and Sullivan are all telecommunication executives. At one time, Welsh served as vice-president for sales and marketing in Mounger, Martin and Sullivan's wireless company, Tritel Corporation. In 1997, Welsh left the position after a compensation dispute, claiming that as an inducement to leave his former employment, Mounger, Martin and Sullivan had promised to convey to him 5% of their collective ownership interest in Tritel.

¶4. On March 28, 1997, Welsh filed suit against Mounger and Martin charging breach of contract, breach of fiduciary duty, wrongful termination, promissory fraud and other causes of action. After two years of discovery, as trial neared in the fall of 1999, Welsh settled his claims against Mounger and Martin for $410,000. In December of 1999, the

---

[1] Other defendants below included Jerry M. Sullivan, Mercury Southern, L.L.C., Airwave Communications, L.L.C., Digital PCS, L.L.C., and Tritel. Sullivan was voluntarily dismissed and Tritel, Digital, Airwave, and Mercury Southern settled prior to trial.

Tritel Corporation went public, and the value of the stock went from virtually zero to nearly $130 per share.

¶5.     Subsequently, Welsh filed an independent claim asserting that Mounger and Martin fraudulently procured the settlement causing Welsh to relinquish his claim to 5% ownership interest just three months before a successful initial public offering (IPO) of Tritel stock substantially increased the value of the stock.  Welsh alleges that Mounger and Martin made false representations in their July 14, 1999, depositions regarding their intentions to go public with Tritel and as to the value of the stock in the company.  Welsh also claimed that Mounger and Martin withheld material facts by not disclosing that interest in an IPO of Tritel stock intensified between their July 1999 depositions and the execution of the settlement on September 22, 1999.

¶6.     Mounger and Martin responded that they did not make false representations nor conceal material facts, nor did they have plans to pursue an IPO at the time of settlement negotiations with Welsh.  They testified that they did not seriously consider an IPO until one month after they settled with Welsh when a similar wireless company went public.  Finally, they asserted that they had no legal duty to supplement their deposition testimony after it was given in July and prior to execution of the agreement in September.  The chancery court, after an extensive hearing, found for Mounger and Martin.

## DISCUSSION

¶7.     The law favors settlement of disputes by agreement of the parties and, ordinarily, will enforce the agreement which the parties have made, absent any fraud, mistake, or overreaching.  *Hastings v. Guillot*, 825 So.2d 20, 24 (Miss. 2002).  The elements of fraud

3

in this state are well established. They include (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury. *Martin v. Winfield*, 455 So.2d 762, 764 (Miss. 1984) (internal citations omitted). Fraud is essentially a question of fact. *Id.* Proving fraud is difficult, as it ought to be. Clear and convincing evidence is required. *Cotton v. McConnell*, 435 So.2d 683, 685 (Miss. 1983). It is well-settled that "where conflicting testimony is presented, expert and otherwise, the chancellor is required to make a judgment on the credibility of the witnesses in order to resolve the questions before the court." Id. (citing *Broadhead v. Bonita Lakes Mall, Ltd. P'ship*, 702 So.2d 92, 101 (Miss. 1997)).

¶ 8.    Welsh asserts that both *Guastella v. Wardell*, 198 So.2d 227 (Miss. 1967) and the Restatement (Second) of Torts § 551 apply to impose liability on Mounger and Martin for fraudulent nondisclosure. Welsh argues that the defendants had a duty to inform him, prior to executing the settlement, that an IPO of Tritel stock was imminent.

### I.    *Guastella v. Wardell* **and the Restatement (Second) of Torts § 551.**

¶9.    The resolution of this matter begins with Chief Justice Ethridge's opinion for the Court in *Guastella*. In that case, we adopted the rule that is now embodied in the Restatement (Second) of Torts § 551. *Guastella*, 198 So.2d at 230.

¶10.    *Guastella* involved a real estate developer (Guastella) who had made certain representations to buyers who had purchased lots in a Pass Christian subdivision. *Id*. at 228. Among those representations was that the subdivision would be restricted to building only

4

houses on the lots. *Id*. At closing, Guastella produced a receipt from the chancery clerk's office that simply stated that restrictive covenants had been filed. *Id*. at 229. However, as the plaintiffs soon found out, the restrictive covenant was only placed on their lots, leaving Guastella free to do as he chose with the remaining ones. *Id*. When Guastella attempted to build three apartment buildings in the subdivision, the plaintiffs sought an injunction. *Id*. at 228. Guastella subsequently appealed the injunction to this Court. *Id*.

¶11.	This Court's opinion cited the then-proposed Restatement (Second) of § 551. *Id*. at 230. We noted that Guastella's silence regarding the manner in which the restrictions had been imposed as opposed to the manner in which they had been represented amounted to "an affirmation that a state of things existed which did not exist." *Id*. We then added:

> With knowledge of these material facts as to the limitations of the covenants as he had recorded them, Guastella was under a duty to disclose this information. Yet he remained silent. Such a case of failure to speak amounted to a suppression of material facts which should have been disclosed, and is in effect a fraud. Restatement (Second) of Torts § 551 (Tent. Draft No. 12, 1966))."

*Id*.

¶12.	We added that a party in the same situation as Guastella owes a duty to disclose to the other party, before consummation of the deal, information that corrects previous statements "made to the other party which are untrue or misleading." *Id*. Noting that the information about the covenants was material to the transaction and that Guastella was under a duty to disclose, this Court affirmed the issuance of the injunction. *Id*. at 230-31.

¶13.	In the current case, the trial court held that *Guastella* was not applicable and that the defendants had no duty to supplement their deposition testimony. The trial court found that

5

the holding in *Guastella* applied only where Guastella had misrepresented the facts at the outset and had a duty of disclosure to correct that affirmative falsehood. The trial court concluded that Mounger and Martin did not misrepresent the facts during their July 1999 deposition testimony and therefore they had no duty to correct the testimony prior to executing the settlement agreement. We agree.

¶14. Additionally, Restatement (Second) of Torts § 551 clearly governs **business transactions**:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a **business transaction** is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
> (2) One party to a **business transaction** is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> * * *
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so . . . .

Restatement (Second) of Torts § 551 (1977) (emphasis added). In *Guastella*, the business transaction was the sale of real property. Moreover, *Guastella* involved a vendor who not only knew that his statement to the purchasers of subdivision lots was erroneous before the transaction was complete, but also deliberately filed restrictive covenants applicable only to the two lots purchased and then led the closing attorney to believe that the restrictive covenants covered all the lots. In the current case, the misrepresentation in question was the answer to a deposition question within the context of a law suit. Mounger's answer to the

6

question regarding discussions with Martin or Sullivan about the possibility of an IPO occurring, as well as Mounger's qualifications "nothing that I would consider discussions" and "other than the fact that that is a possible scenario at some point in the future" are responsive to the narrow questions posed, and Welsh's attorney could have followed up with more probing questions.

¶15. Although Mounger and Martin were contacted, subsequent to the depositions, by six different investment firms who presented sales "pitches" regarding their services of providing equity financing, and the possibility of an initial public offering (IPO), the idea of "going public" was only one of several options under consideration at the time the settlement agreement with Welsh was reached on September 22, 1999. The record supports the chancery court's finding that only after the similar wireless company (Triton) went public with a tremendously successful IPO in October 1999 was the decision made to go public. The chancery court found that:

> Looking at the testimony of Martin and Mounger as a whole, this Court finds that there was sufficient disclosure. Had there only been deposition testimony from Mounger before this Court the result may have been different. This Court finds that Mounger's deposition testimony was evasive, however, it was responsive to the narrow questions posed by opposing counsel. Counsel for the plaintiff failed to follow up with probative questions to elicit substantive information regarding the company's IPO discussions.

¶16. We find no error with the trial court's decision that *Guastella* is distinguishable.

## II.     Mississippi Rule of Civil Procedure 26(f).

¶17. The Mississippi Rule of Civil Procedure 26(f) provides the appropriate answer to whether, subsequent to the depositions, Mounger and Martin had a duty to disclose their contacts with investment banks in this litigation situation, as follows :

7

(f) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired except as follows:

\* \* \*

(2) A party is under a duty seasonably to amend a prior response if that party obtains information upon the basis of which (A) the party knows that the response was incorrect when made, or (B) the party knows that the response, though correct when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Miss. R. Civ. P. 26(f).

¶18. An explanation of Miss. R. Civ. P. 26(f)'s "knowing concealment" in the settlement fraud context is found in C.J.S. as follows:

An unfair concealment of material facts may constitute grounds for relief against a compromise, as where one of the parties has superior means of ascertaining the facts and conceals the true state of affairs, especially if the concealment is of facts which the adverse party has a right to be informed. Every omission to communicate facts, although material, is not necessarily fraudulent. Where the parties are dealing at arm's length, a mere failure of one party to disclose facts which are not asked about is not sufficient to invalidate the agreement, where the party has done nothing to mislead the other party . . . Moreover, to make a nondisclosure a fraudulent concealment, it must be intentional.

15A C.J.S. *Compromise & Settlement* § 53 (2002). The chancery court properly applied Miss. R. Civ. P. 26(f) to Welsh's settlement fraud claim. Furthermore, the chancellor applied the ***Corpus Juris Secundum*** analysis when she found that Mounger and Martin did not have "superior means of ascertaining the facts." ("The Plaintiff had equal access to the stock market to compare the productivity of similar companies and determine for himself whether the value offered for his stock was adequate.") The chancery court found that the parties were "dealing at arm's length"and that Mounger and Martin's failure to disclose was "a mere failure of one party to disclose facts which are not asked about."

8

¶19.    The chancery court found that Mounger and Martin had "done nothing to mislead the other party," and that Mounger and Martin did not "intentionally" conceal the facts as they knew them to be in the July 1999 deposition testimony.  We find no error.

### III.    Exclusion of memorandum.

¶20.    Finally, Welsh argues that the trial court erred in excluding a memorandum that he offered into evidence which purported to show that the defendants had expressed plans to offer Tritel stock for sale in the first quarter of 2000.  The internal memo was written by a representative of Donaldson, Lufkin & Jenrette (DLJ) following a meeting with Mounger and Martin on August 25, 1999. Welsh notes that this was highly probative of the central issue of whether Mounger and Martin had plans or expectations of going public with Tritel a full month before executing the settlement agreement.

¶21.    Welsh first attempted to introduce the memorandum during direct examination of Mounger.  The defense objected on hearsay grounds.  Welsh then attempted to lay the foundation by questioning a senior manager of DLJ, who testified that he did not prepare the memo and did not know who had prepared it; but that it was a regular business practice of DLJ to document such a meeting.  The trial court excluded the document, holding that Welsh failed to lay a proper foundation to admit the document over the hearsay objection.

¶22.    Welsh now argues that the DLJ memo was offered for admission through a qualified authenticating witness under the business record exception to the hearsay rule, M.R.E. 803(6).  He contends that M.R.E. 803 requires only that the source of the material be "an informant with knowledge about who is acting in the course and scope of regularly

9

conducted activity," and that the document should not be excluded unless the "source of the information...lacks trustworthiness."

¶23. This Court reviews a chancery court's decision to exclude evidence for abuse of discretion — that is, this Court defers to the chancery court's decision and will not reverse the decision unless it was unreasonable and unduly prejudicial. *Harrison v. McMillan*, 828 So.2d 756, 765 (Miss. 2002).

¶24. The memorandum provides in part:

> This summer we contacted the Company regarding a potential IPO and we met with the Company in August to discuss such transactions. At that time, Tritel indicated it would likely wait until the first quarter of 2000 to pursue an IPO so that it could instead focus its attention on successfully launching commercial service in certain of its markets.

¶25. The Mississippi Rules of Evidence govern whether a document has been authenticated:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
> By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
> Testimony that a matter is what it is claimed to be. . . .

Miss. R. Evid. 901.

¶26. Additionally, the "business records" exception to the hearsay rule provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinion or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or self-authenticated pursuant to Rule 902(11), unless the source of

10

information or the method or circumstances of preparation indicate lack of trustworthiness.

Miss. R. Evid. 803(6).

¶27. The chancery court did not abuse its discretion when it excluded the memorandum from evidence. Welsh never authenticated the document because Welsh's witness never identified the memorandum as one that documented the meeting, i.e. that it was "what it is claimed to be" or a "business record." Although Welsh's witness testified that such a memorandum "was used internally with our equity department," he never testified: that it was "made at or near the time by, or from information transmitted by, a person with knowledge"; that it was "kept in the course of regularly conducted business activity"; and that "it was the regular practice of that business activity to make the memorandum." Although Welsh's witness worked for Donaldson, Lufkin & Jenrette, he "was not involved in the preparation" of the memorandum, and did not "testify to the accuracy" of the memorandum. Therefore, the chancery court did not err in excluding the memorandum.

## CONCLUSION

¶28. The record in this case does not reveal anything approaching fraud, mistake, or overreaching, and the chancellor was in the best position to decide that issue. Moreover, fraud is a finding of fact, and this Court will not disturb findings of fact on appeal unless they are against the manifest weight of evidence or clearly erroneous. We affirm the judgment of the chancery court.

¶29. **AFFIRMED.**

11

**SMITH, C.J., CARLSON AND DICKINSON, JJ., CONCUR. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION. WALLER, P.J., DIAZ, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING.**

**EASLEY, JUSTICE, DISSENTING:**

¶30.    Welsh brings this appeal from an adverse ruling alleging that the chancellor failed to recognize both that the settlement of a previous lawsuit was a business transaction settlement and our previous ruling in *Guastella v. Wardell*, 198 So.2d 227 (Miss. 1967), adopting the Restatement of Torts (Second) § 551 setting out the disclosure requirement in a business transaction.  As I agree, I must respectfully dissent and would reverse and remand for further proceedings.

¶31.    In March 1997, Welsh commenced an action against several parties, including but not limited to, William M. Mounger, II, E.B. Martin, Jr., MSM, Inc. and Mercury Wireless Management, Inc., collectively known as the Defendants.  Welsh alleged, inter alia, wrongful termination, breach of contract, and other causes of action which revolved around the Defendants' refusal to convey a percentage of stock in certain entities which held digital Personal Communication Services (PCS) from the Federal Communications Commission. Welsh alleged that the Defendants had promised him stock ownership in the entities as an enticement to take a job as an executive at MSM.

¶32.    Before trial, the parties settled their claims but only after two years of extensive discovery.  Subsequent to the execution of the settlement, the Defendants engaged in an Initial Public Offering (IPO) of stock for Tritel, Inc., a corporation that formed during the

discovery period.[2] This IPO led to the current cause of action as Welsh has claimed fraud in the inducement of the settlement.

¶33. During discovery in the initial 1997 lawsuit, the Defendants made several representations to Welsh. These included: there were no expectations of Tritel making an IPO; there was no plan for an IPO; the Tritel board of directors were of the opinion that Tritel shares were worth zero; Tritel had received no information from any investment firm in regards to the potential value of Tritel shares if an IPO were to take place; the Tritel board had not discussed contacting an investment firm; and no investment firms had been contacted about an IPO.

¶34. At trial below of this action, Welsh argued that this information played a large part in his acceptance of the settlement of the 1997 case. His position was that information produced during discovery and at trial showed that subsequent to and/or during the time that these representations were made to him, the Defendants were actively discussing, meeting, contacting and planning an IPO. Indeed, Tritel's board of directors approved an IPO less than two full months after the execution of the settlement agreement.

¶35. Welsh claimed that even if the representations made by the Defendants were true at the time they were made, subsequent occurrences made that information false and/or misleading. Indeed, a number of events occurred less than 10 days after the depositions in the 1997 lawsuit. Some of these facts included a meeting with Merrill Lynch representatives the same day of the depositions, a presentation by Merrill Lynch the day after the

---

[2] Tritel was now the holder of most of the PCS licenses and is the corporation in which Welsh claims he should have been given a percentage of stock.

13

depositions, a second recommendation by another firm four days after the depositions and Tritel sent a letter indicating that it was considering going public and the board of directors received a report that many investment companies recommended going public less than 10 days after the depositions. Therefore, the Defendants were under a duty to correct their earlier representations. The chancellor found that the Defendants were under no duty to disclose their new information because the Defendants' statements were true at the time they were made. As a result, the chancellor found that Welsh had failed to establish his case by clear and convincing evidence and found for the Defendants. Aggrieved, Welsh appeals to this Court.

¶36.     The resolution of this matter begins and ends with Chief Justice Ethridge's opinion for the Court in *Guastella v. Wardell*, 198 So.2d 227 (Miss. 1967). In that case, we adopted the rule that is now embodied in the Restatement (Second) of Torts § 551. *See* 198 So.2d at 230.

¶37.     *Guastella* involved a real estate developer (Guastella) who made certain representations to buyers who had purchased lots in a Pass Christian subdivision. *Id*. at 228. Among those representations was that the subdivision would be restricted to building only houses on the lots. *Id*. At closing, Guastella produced a receipt from the chancery clerk's office that simply stated that restrictive covenants had been filed. *Id*. at 229. However, as the plaintiffs soon found out, the restrictive covenant was only placed on their lots, leaving Guastella free to do as he chose with the remaining ones. *Id*. When Guastella attempted to build three apartment buildings in the subdivision, the plaintiffs sought an injunction. *Id*. at 228. Guastella subsequently appealed the injunction to this Court. *Id*.

14

¶38. This Court's opinion cited the then-proposed Restatement (Second) of § 551. 198 So.2d at 230. We noted that Guastella's silence regarding the manner in which the restrictions had been imposed as opposed to the manner in which they had been represented amounted to "an affirmation that a state of things existed which did not exist." *Id*. We then added the following:

> With knowledge of these material facts as to the limitations of the covenants as he had recorded them, Guastella was under a duty to disclose this information. Yet he remained silent. ***Such a case of failure to speak amounted to a suppression of material facts which should have been disclosed, and is in effect a fraud.*** Restatement (Second) of Torts § 551 (Tent. Draft No. 12, 1966))."

*Id*. (emphasis added).

¶39. We added that a party in the same situation as Guastella owes a duty to disclose to the other party, before consummation of the deal, information that corrects previous statements "made to the other party which are untrue or misleading." *Id*. Noting that the information about the covenants was material to the transaction and that Guastella was under a duty to disclose, this Court affirmed the issuance of the injunction. *Id*. at 230-31.

¶40. As now, Restatement (Second) of Torts § 551 (2)(c) provides that a party to a transaction maintains a duty "to exercise reasonable care to disclose to the other before the transaction is consummated... (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so."

¶41. In the case sub judice, I find a similar situation. During settlement negotiations for a suit based on an underlying business transaction, the Defendants in this case made various

15

representations to Welsh that there was no market for their stock and that there were no expectations that their company would go public, i.e. no plans for an IPO. These representations were made during depositions that took place on *July 14, 1999*. **The very day of the deposition**, the Defendants had a meeting with representatives from Merrill Lynch. During a presentation the following day, Merrill Lynch recommended that the Defendants take Tritel public.

¶42. **Four days later**, Robinson-Humphrey made a recommendation that the Defendants take Tritel public. On *July 23, 1999*, **less than 10 days after the depositions**, the company issued a letter that it was considering going public. That same day, it was reported to Tritel board of directors that there was an inundation of recommendations from various investment banking firms that they go public. In the same report, the board was notified that Tritel management was actively considering whether to go public.

¶43. As a result of these and other similar occurrences, it is clear that around the middle of August 1999, the representations made to Welsh were no longer correct, or at the very least, were now misleading. These representations involved the valuation of stock which was one of the basic and essential factors involved in the settlement negotiations between the parties. Therefore, at that point the Defendants owed a duty to correct the misleading or untrue characteristics of their earlier statements.

¶44. However, the Defendants took no steps to correct the situation. **The parties held a final settlement meeting with Welsh on** *August 25, 1999*. At this meeting, the Defendants made the representation that they would not be going public any time in the **foreseeable**

**future.  The parties later agreed to a settlement in principle on** *August 28, 1999***.  The settlement agreement was finally executed on** *September 22, 1999***.**

¶45.    Between the final settlement meeting and the execution of the agreement, the record indicates further discussions with investment firms regarding IPO's of Tritel's stock.  These discussions culminated in the board of directors authorizing the filing for the IPO on November 12, 1999, less than three full months after the final settlement meeting and less than two months after the execution of the settlement agreement.

¶46.    The chancellor distinguished *Guastella* from the case at bar finding that the representations made by the Defendants were true when made.  However, *Guastella*, in conjunction with the Restatement (Second) of Torts § 551, requires that when one obtains knowledge which makes earlier representations either false or misleading, he has an affirmative duty not remain silent and to correct those representations.

¶47.    Assuming the veracity of the Defendants' representations at the time they were made, the facts demonstrate that such representations subsequently became either untrue, or at the very least, misleading.  Therefore, in my view the Defendants had a duty to correct this information, as they knew it was material to the settlement agreement.  The chancellor's decision is inconsistent with our decision in *Guastella*.  Therefore, I must respectfully dissent as I would reverse and remand this case.