# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CP-01135-COA

## CONSOLIDATED WITH

## NO. 2017-CP-00632-COA

**MARY MONTGOMERY**                                                                 **APPELLANT**

**v.**

**GLEN W. MONTGOMERY**                                                              **APPELLEE**

DATE OF JUDGMENT:            09/10/2020
TRIAL JUDGE:                 HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:   JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      MARY G. MONTGOMERY (PRO SE)
ATTORNEYS FOR APPELLEE:      MARK V. KNIGHTEN
                             STEVEN JAY MILLER
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 AFFIRMED - 05/24/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1.     Mary Montgomery challenges the Jackson County Chancery Court's April 12, 2017 judgment granting her ex-husband Glen Montgomery a divorce on the ground of habitual cruel and inhuman treatment and the chancery court's September 10, 2020 judgment concerning the division of the parties' assets.

¶2.     After bifurcating the divorce action, the chancery court first rendered a judgment of divorce, which Mary appealed. This Court dismissed the appeal for lack of jurisdiction because the judgment of divorce was not final and appealable. After the entry of the

chancery court's final judgment adjudicating the equitable division of the parties' property, Mary filed a second appeal, raising numerous issues. The Mississippi Supreme Court consolidated Mary's first appeal with her second one for purposes of the record. After reviewing the issues, we affirm the chancery court's judgment of divorce and final judgment regarding the division of property and other financial matters.

**Facts**

¶3.     Mary and Glen were married on April 12, 1986. They had two children who were both adults and emancipated at the time of the divorce. The parties separated on December 11, 2011. Glen worked at the Moss Point Fire Department and for Jackson County. Over the years, Mary had worked as an office manager, as a clerk in an optometrist's office, and as a sitter/companion to several elderly individuals. Together Mary and Glen owned a commercial building in Moss Point, which they rented out, and two other residential rental properties. After their separation, Mary remained in the marital home which was later damaged in Hurricane Isaac. The bank then foreclosed upon the home because the parties failed to make repairs.

¶4.     About eight months after the separation, Mary filed for divorce against Glen on the ground of habitual cruel and inhuman treatment. A trial was held on March 20, 2014. After hearing Mary's proof, the chancellor dismissed her complaint and Glen voluntarily dismissed his counterclaim.[1] The parties remained legally married but separated.

¶5.     On July 14, 2016, Glen filed a complaint for divorce against Mary in the Jackson

---

[1] The final judgment dismissing Mary's complaint in the Jackson County Chancery Court (Cause No. 2012-1445CB) was entered into the record.

County Chancery Court. Glen alleged as grounds Mary's habitual cruel and inhuman treatment as well as desertion and sought an equitable division of the property that the parties had accumulated during their marriage. Mary answered the complaint pro se, raising a variety of issues, such as the medical bill she incurred when Glen had her placed in the psychiatric ward of the local hospital. However, Mary answered with no specific denial of Glen's grounds. Nor did she file a counterclaim for divorce.

¶6. Because Glen had asked for temporary relief, on August 24, 2016, the special family master and chancery court judge entered an order allowing the parties to sell items they jointly owned if they agreed. If they could not agree on the distribution of the resulting funds, they were to deposit them into the registry of the court.[2]

¶7. On August 31, 2016, Mary filed a "Motion for Replacement of Name on Medical Bills," in which she sought to have the medical bills she incurred from her hospital stay in the psychiatric ward put in Glen's name because he had caused to her to be picked up by the Sheriff and hospitalized.

¶8. The chancery court bifurcated the trial on the issues, with no objection from the parties. First, the court heard evidence on the grounds for divorce on April 12, 2017. At the trial Glen was represented by counsel; Mary represented herself. Glen testified that he and Mary had their ups and downs during the marriage, but that in the last few months of 2011,

---

[2] The order also provided that any proceeds from the pending insurance claim they had on their former marital home were to be deposited with the court. However, Glen later testified that Mary received checks from the insurance company for the damage to the home as well as for the property loss. Neither was deposited with the clerk.

Mary would get upset about everything—her hair, her clothes, etc. She was taking Adderall at the time as well as Ambien to help her sleep at night. At Thanksgiving, when Glen asked when they would get together with his family, Mary told him that his family was no longer welcome in their home, especially his mother. Glen testified that on December 6, 2011, Mary ran him out of the house after "going ballistic" over a judgment rendered against him personally, which Glen had been paying. Glen said Mary had been upset about that, but in December 2011, she was more than upset—she started throwing things at him and threatened to kill him. Because there were loaded guns in the house, Glen testified that he became afraid and left the home. After he left, he contacted Mary's family, and they tried to talk to her without success. Glen stated:

> They talked to her, but the next day Mary called her mom and said, "Don't ever come to my house no more. I'm going to sign charges on you," and she called the next-door neighbor and, I believe -- she told me the FBI, that her mom and them tried to kidnap her and go put her in the psych ward, that she had to fight them off and beat them up and it was a terrible scene.

Glen ended up signing papers to have Mary transported to a hospital to be evaluated. Glen testified that he had tried to get Mary to see a marriage counselor or priest as well, but she refused.

¶9.     Glen further testified that several years after the separation, during the pendency of Mary's first divorce complaint, she had gone to the sheriff's department and tried to file charges against him for rape. Glen said that he worked for the fire department and that Mary's charges could have affected his job.

¶10.     Glen testified that Mary continued to live in the marital home after the separation.

4

After Hurricane Isaac, the home flooded, but Mary did nothing to repair it even though they received insurance money to do so. Glen said that the bank eventually foreclosed on the home to protect its asset because no repairs had been done.[3] The Bank then sued both him and Mary on the deficiency owed after the home had been auctioned.

¶11. In her cross-examination of Glen, Mary said she had become angry with him for having so many judgments against him, and on December 6, 2011, she told him to leave. She admitted during her questioning that she had kicked Glen out of the home "because of all the lawsuits." She denied that Glen had proposed seeing a counselor or that she had threatened to kill him. A review of the transcript of the divorce hearing shows that most of Mary's "questions" were statements. Although the hearing at that point concerned the grounds of divorce, Mary brought up matters concerning the marital property, her lack of a home to live in, and her need for spousal support. When the court attempted to direct Mary in proper questioning, Mary was not attentive to the court. Despite the wide latitude given her by the chancery court, Mary further questioned Glen about money given to his mother, about who paid for his parents' funeral expenses (and how), and about Glen's sale of the lawn care business.

¶12. Glen's corroborating witness was his neighbor Tonya Lynd. She testified that she had known both parties for twenty-three years. She said that on the day after they separated, Mary called her and said that she had told Glen to leave. Tonya also said that sometime soon

---

[3] Glen testified that after appealing the adjuster's proposed payout, Nationwide sent two checks—one for the home repairs and one for the contents. Glen said Mary received these. A contractor started tearing out the flooring but later stopped.

after the separation, Mary had told her that she wished she could shoot Glen. Tonya also testified about a time after the house had flooded that she received a call from another neighbor saying that she might want to check on Mary. Tonya found Mary loading her vehicle with items, like a swing and other boxes. Mary said she did not think she would see her youngest son graduate because of the pills she had taken. Mary was dry-heaving and, given the circumstances, Tonya called the police. The Jackson County Sheriff's Department investigative report that verified Tonya's testimony about the incident was entered into evidence. Tonya also testified that she saw Mary's brothers and sisters trying to get Mary into a car.

¶13. During her cross-examination of Tonya, Mary admitted to the court that she had taken six Ambien pills at the time Tonya called the police. She told the chancery court that she did this so that she could sleep for two days. Mary asked Tonya if she remembered how Mary had asked her if she would go to the fire station to meet Glen and get Mary's half of the tax refund. Tonya said she vaguely remembered this. Tonya did admit that she was surprised when Glen had Mary committed to the psych ward for evaluation.

¶14. After hearing testimony, the chancery court ruled from the bench and granted Glen a divorce on the ground of habitual cruel and inhuman treatment. Mary voiced no desire to enter any further evidence on the issue of the divorce. The court then began hearing testimony on the issue of the division of the property of the parties.[4]

¶15. Glen testified that the parties owned a commercial building in Moss Point, valued

_____

[4] As discussed *infra*, testimony regarding the division of assets was not completed that day.

6

between $150,000 and $175,000, on which $122,000 was owed. He testified about two other residential properties: a house located at 500 Maid Marion that he valued at $54,000, on which $22,000 was owed, and a house located at 9740 Wilkerson Lane that was presently on the market for $81,000. Glen thought it might sell for $79,000, but it had a $52,000 mortgage.

¶16.    Glen testified that the only other assets of the parties included his 2014 Toyota Camry which he valued at $14,000, on which he still owed $15,000, and Mary's 2006 Ford Taurus that was paid for and worth $4,000 to $5,000. Glen testified that he had a PERS (State employee) retirement account that had $61,000 in it at the time of their separation in 2012; it was worth approximately $89,000 at the time of the trial.[5] Mary had an IRA account with $3,000. There were no other assets, other than a 12-gauge Remington shotgun, an old Winchester rifle, and two handguns (a Smith & Wesson .357 magnum and a Baretta .40-caliber pistol). Glen entered into evidence deeds to the properties and a list of his expenses for their upkeep. He also entered an exhibit listing the back taxes owed on the properties as well as insurance. Glen also entered a 2013 appraisal of the marital home. He contended that Mary was the reason why the marital home was foreclosed upon when she refused to make repairs.

¶17.    At the end of testimony that day, Mary asked the court to rule on her motion concerning the replacement of Glen's name for her name on the hospital bill for her psychiatric evaluation. The court said that he would consider that when making his equitable

---

[5] Glen testified that since the separation, he created his own IRA which had $8,000 in it.

division of the parties' assets. She also asked about spousal support, and the court told her to serve Glen with a Rule 81 summons, M.R.C.P. 81, on the motion and get it on his docket for a hearing. At the court's direction, the judge's clerk had prepared the judgment of divorce which the court signed and had entered. Both parties were given copies of the final judgment of divorce. It noted that the matters of alimony and the equitable division of the property would be addressed in a later judgment, and the court reset the matter for further hearing to be held on August 23, 2017.

¶18. On May 3, 2017, Mary filed a "Motion to Appeal Judgment," which was construed as a notice of appeal. On March 3, 2019, this Court dismissed Mary's appeal as premature because the chancery court had not entered a final, appealable judgment. *Montgomery v. Montgomery*, 281 So. 3d 171, 174 (¶9) (Miss. Ct. App. 2019).

¶19. After remand, on January 8, 2020, the chancery court ordered that the commercial property that the parties owned be valued by Charlie Green, who would also determine how to list it for sale. On January 17, 2020, the chancery court appointed Green to list and sell the commercial property. Green was ordered to communicate any reasonable offer to the parties. If they did not agree, the chancery court would set the matter for an immediate hearing.

¶20. The chancery court resumed taking testimony on the matters concerning the equitable division of the property on September 10, 2020. Glen testified that he had retired and moved to Buffalo, Missouri. He currently drove a bus for a blood donation center and had remarried. He told the court that since the last hearing, the rental properties had sold and the

8

net gain, $36,202, was deposited in the court's registry. He said it should all go to Mary if he could keep his PERS retirement, valued at $61,000 in 2011. Glen testified that he paid the capital gains tax on the properties when they were sold, totaling $6,256.93 for which he would ask no reimbursement from Mary if he could keep his PERS retirement account. He also offered to give Mary the commercial building if he could be relieved of any obligation on it. There was an outstanding mortgage of $95,000. Glen testified that there may be $40,000 worth of equity in the building. The mortgage payment on the building was $1,661.22 each month, and it was rented out at $1,800 per month. The renter had been there for over eighteen years and paid his rent regularly. Glen testified that the parties had also purchased a Wyndham timeshare for $20,000 and a monthly maintenance fee thereafter. Glen had been paying the monthly maintenance fee to keep it out of foreclosure.[6] Glen stated there were no other assets and no other outstanding debts of the parties.

¶21.    In her cross-examination of Glen, Mary asked questions about his sale of the lawn care business prior to their separation, about a lawsuit brought by a former partner Glen had brought into their business, and garnishments on Glen's wages. Mary entered into evidence, Glen's January 7, 2011 paycheck showing that he was garnished.

¶22.    Prior to the lunch break, the chancery court reviewed with Mary what Glen had offered to give her during his testimony. The court asked Mary to think about that offer over lunch. Mary had time over lunch to talk with her mother who was present with her, and

---

[6] Glen testified that Mary had previously blocked him from the account and when she did not pay the maintenance fee, the property went into foreclosure. He paid $1,776.25 to stop the foreclosure and has paid the maintenance fee since.

when court resumed, Mary told the court that she rejected Glen's offer but would agree to a total cash payment of $48,000, which would include the $36,202.12 in the registry of the court, to resolve the property issue. Glen's attorney calculated that Glen would need to pay an additional $11,797.88 to meet Mary's demand. Mary also agreed that Glen could have sixty days to pay that amount. The parties' full agreement was recited into the record by Glen's attorney, which included Glen's keeping the commercial building and the Wyndham timeshare along with the obligations on those assets. Mary agreed in open court to the terms of the settlement.

¶23. A "Final Judgment" was then drafted, signed by the parties, and entered by the court on that same day, September 10, 2020. It embodied the parties' agreement that Glen would pay Mary the total amount of $48,000 "representing a final and complete resolution of any asset distribution, retirement distribution or support obligation that may be owed" by Glen to Mary. Of this $48,000, $36,202.12 came from the sale of the two rental homes which had been held in the registry of the court. Glen was ordered to pay Mary the remaining $11,797.88 by November 10, 2020. The court ordered that Glen retain possession and ownership of the commercial building and the Windham timeshare property and assume all responsibilities associated with those properties. Glen was enjoined from disposing of any asset until he paid the $11,797.88 and the court's judgment would constitute a lien on all assets until the full amount was paid to Mary. The judgment also allowed Glen to retain full ownership of his PERS retirement account. The matter was set for review on November 10, 2020, to ensure that Glen's payment had been made.

10

¶24.    On October 6, 2020, Mary filed a "Motion to Appeal Judgment," and the chancery court allowed Glen to interplead the $11,797.88 owed to Mary into the registry of the court.

¶25.    On November 12, 2020, the Mississippi Supreme Court consolidated Mary's first appeal with her second appeal.

### Identification of Issues

¶26.    In the first appeal, which Mary advocated pro se, she identified fifteen "issues" however, many were not legal issues for this court to consider but rather complaints about the overall proceedings.[7]  The only issues that could conceivably be construed as legal issues included "whether the Chancellor erred in allowing admittance of papers into evidence," but Mary does not identify what evidence was allegedly incorrectly admitted.  In addition, a review of the record reveals that Mary failed to object to the admission of any evidence. Mary further claims that the Chancellor erred in bifurcating the trial.  However, the record shows that Mary did not object to a bifurcation of the hearing and, thus, she waived this issue.  "It is a long-established rule in this state that a question not raised in the trial court will not be considered on appeal." *City of Hattiesburg v. Precision Const. LLC*, 192 So. 3d 1089, 1093 (¶18) (Miss. Ct. App. 2016).  Mary further states as an issue "whether the Chancellor erred in not granting Forma Pauperis."  The record does reflect that Mary filed

---

[7] These include "whether the court reporter erred and may have missed important information; whether the judge erred in screaming at a pro se party; whether Appellee erred in not stating the truth that he was abused; whether the Chancellor erred in not allowing Appellant to get papers; whether the Chancellor erred in hearing the case; whether the Chancellor should be held liable for decisions made by Special Master; whether Appellee Attorney erred in abusing the judicial system; whether subornation [sic] and perjury charges will be addressed; and whether the State of Mississippi and the Law Library have needed resources."

a motion to proceed in forma pauperis in her first appeal which the chancery court denied. However, that issue is moot because the first appeal was processed and completed. Thus, the only legal issue from Mary's first appeal that we will discuss is whether the Chancellor erred in granting Glen a divorce based on habitual cruel and inhuman treatment.

¶27.	As in her first appeal, in Mary's second appeal she listed several statements of alleged facts as if they were issues.[8] The only legal issue Mary cites is "that the judge should have seen the unfairness of the division of the assets."

¶28.	Accordingly, we will proceed to review the chancery court's rulings for any errors in granting Glen a divorce on the ground of habitual cruel and inhuman treatment and in its treatment of the division of the assets of the parties.

### Standard of Review

¶29.	"We will not disturb a chancellor's findings unless [they are] manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Oswalt v. Oswalt*, 981 So. 2d 993, 995 (¶5) (Miss. Ct. App. 2007). We must respect the chancery court's findings if

---

[8] These include that Mary (Appellant) was told by the court reporter that she could not submit any more evidence; that two people on her "pro se" team were not allowed to enter the courtroom including her eighty-eight-year-old mother but the Appellee was allowed to bring his lawyer into the courtroom; that when Appellant could not find what number an exhibit was, the judge said she better find it or he would not accept it; that the court reporter did not stay during her lunchtime to help Appellant number her exhibits; that Appellant was nervous and stressed because Glen (Appellee) had committed perjury; that after lunch, Appellant tried to reach a settlement but broke down in tears; that Appellee's attorney said that the judge did not care about perjury charges; that Appellee's attorney said there was not a pension or any deferred compensation that was not listed; that Appellant stated there was dissipation of assets; that the Appellee's attorney snatched evidence from her hand; and that she was upset and should have put on the papers that she signed under duress.

12

they are supported by credible evidence and not manifestly wrong. *Mizell v. Mizell*, 708 So. 2d 55, 59 (¶13) (Miss. 1998).

## I. Whether chancery court erred in granting Glen a divorce on the ground of habitual cruel and inhuman treatment.

¶30. In the brief she submitted during the first appeal, Mary reviews the testimony in the transcript and gives her factual response. For example, Mary says, "Glen states that Mary didn't remodel the house. I tried. I have plenty of volunteers to confirm. Tonia Lynn, the witness, saw me. I forgot to bring it up." However, Mary should have elicited this testimony at trial; we are a court of review and we do not consider new evidence or reweigh the evidence. "Courts of review are not to undermine trial court authority by replacing the judgment with its own." *Miller v. Miller,* 838 So. 2d 295, 297 (¶4) (Miss. Ct. App. 2002).

¶31. Additionally, Mary fails to present any legal authority to support her challenge to the chancery court's grant of a divorce. "The failure to cite authority in support of an issue precludes this Court from considering the issue on appeal." *Welch v. Bank One Nat'l Ass'n*, 6 So. 3d 435, 439 (¶14) (Miss. Ct. App. 2009) (quoting *Kirkley v. Forrest County Gen. Hosp.*, 991 So. 2d 652, 662 (¶35) (Miss. Ct. App. 2008)). We note that Mary has been proceeding in this case pro se. But "[w]hile pro se litigants are afforded some leniency, they 'must be held to substantially the same standards of litigation conduct as members of the bar.'" *Dobbs v. Crawford*, 177 So. 3d 448, 452 (¶13) (Miss. Ct. App. 2015) (quoting *Sumrell v. State*, 972 So. 2d 572, 574 (¶6) (Miss. 2008)). "Even a pro se litigant is held to the same procedural and evidentiary requirements as individuals represented by counsel." *Robinson v. Newsome*, 88 So. 3d 767, 769 (¶4) (Miss. Ct. App. 2011) (quoting *Dethlefs v. Beau Maison*

*Dev. Corp.*, 511 So. 2d 112, 118 (Miss. 1987)).

¶32.    Accordingly, because Mary fails to present the proper factual and legal authority to support her claim, we find that she has waived our consideration of this issue on appeal. Notwithstanding this waiver, we would nonetheless affirm the chancery court's grant of divorce to Glen for lack of manifest error.

¶33.    To be entitled to a divorce because of cruel and inhuman treatment, a party must show that the offending spouse (1) endangered life, limb or health or created an apprehension of such danger or (2) acted in a manner so unnatural or infamous as to make the marriage unfeasible to continue. *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶15) (Miss. Ct. App. 2020). "Divorces based upon habitual cruel and inhuman treatment are necessarily fact-intensive and require a case-by-case analysis." *Rankin v. Rankin*, 323 So. 3d 1073, 1077 (¶9) (Miss. 2021).    An act that may not individually be sufficient to establish cruel and inhuman treatment, may contribute to such a finding when combined with other conduct. *See Harmon v. Harmon*, 141 So. 3d 37, 41-42 (¶15) (Miss. Ct. App. 2014).    The chancery court must consider the offending spouse's conduct and its impact on the non-offending spouse (i.e., a dual focus). *See Littlefield v. Littlefield*, 282 So. 3d 820, 824-25 (¶8) (Miss. Ct. App. 2019).

¶34.    In this case, Glen testified that on the day of their separation, Mary threw things at him, threatened to kill him, and told him to leave.  He testified that, with loaded guns in the house, he legitimately feared her, given the state she was in.  Her conduct was so bizarre, he contacted her family who apparently tried to get her to seek medical or psychiatric help. Glen said he eventually signed paperwork to have her taken to the hospital.  Glen called

14

Tonya Lynd as his supporting witness to show the court that Mary's behavior had been unnatural on other occasions. Tonya testified about an incident where she had to call the police because of Mary's behavior and medication overdose. The chancery court was able to observe the demeanor of the parties during the trial and, from the testimony presented, granted the divorce. The chancery court was aware that the parties had been separated and had not cohabited together for five years, and that a prior court had determined that Mary had not proved any grounds for divorce. The chancery court determined that the evidence was sufficient to support a finding of habitual cruel and inhuman treatment and granted a divorce to Glen. "Even if we do not agree with the chancellor or might arrive at a different conclusion, if we cannot say with reasonable certainty that his findings were manifestly wrong and against the overwhelming weight of the evidence, we are still bound by his findings." *Stephenson v. Stephenson*, 332 So. 3d 360, 362 (¶6) (Miss. Ct. App. 2021) (quoting *Torrence v. Moore*, 455 So. 2d 778, 780 (Miss. 1984)). Accordingly, we find that the chancery court did not err in granting Glen a divorce.

II. **Whether the chancery court erred in approving the division of the assets of the parties.**

¶35. In the brief she filed in her second appeal, Mary provides even less structure to her argument. She merely lists as issue 22 "[j]udge should have seen the unfairness in the division of the assets." She presents no specific argument about the settlement that she not only agreed to, but actually proposed. She fails to cite any further facts from the record or authority to support her claim of error. "The failure to cite authority in support of an issue precludes this Court from considering the issue on appeal." *Welch*, 6 So. 3d at 439 (¶14)

15

(quoting *Kirkley v. Forrest Cnty. Gen. Hosp.*, 991 So. 2d 652, 662 (¶35) (Miss. Ct. App. 2008)).

¶36.    Notwithstanding Mary's waiver of this issue, we note that chancery courts have the authority to order an equitable division of property. *Ferguson v. Ferguson*, 639 So. 2d 921, 927 (Miss. 1994). This Court has a "limited standard of review of property division and distribution in divorce cases." *Rodriguez v. Rodriguez*, 2 So. 3d 720, 725 (¶8) (Miss. Ct. App. 2009) (quoting *Bowen v. Bowen*, 982 So. 2d 385, 393 (¶32) (Miss. 2008)). In this case, the chancery court itself made no ruling on the division of the assets. Instead, the parties came to an agreement. In Glen's testimony, he reviewed each of the parties' assets, and made an offer to Mary concerning their disposition. The record reflects that over the lunch hour Mary reviewed his offer, and when court reconvened she made a counter-offer of a lump sum amount on the record. She indicated that she was "just ready for it to be over." Glen's lawyer told the court that Mary had talked to her mother who was in the courtroom at this time, and that Mary had agreed to taking the funds already held by the chancery clerk from the sale of the rental properties ($36,202.12) plus the amount needed to reach the $48,000 settlement figure. The court asked Mary if she agreed with that, to which she replied that she did. The court confirmed again with Mary that she was agreeing to settle all issues regarding the equitable distribution of the property for $48,000, to which she replied, "Yes, sir." There is no indication in the record that Mary was upset, distraught, or under any duress. The chancery court entered an order that day, incorporating the parties' agreement. "A property settlement agreement has the character of other contracts and also has the nature

16

of a court order when it is incorporated into the final decree." *Martinez v. Martinez*, 860 So. 2d 1247, 1250 (¶16) (Miss. Ct. App. 2003) (citing *East v. East*, 493 So. 2d 927, 932 (Miss.1986)). When there is a meeting of the minds, a settlement becomes a contract, binding on the parties. *Hastings v. Guillot*, 825 So. 2d 20, 23 (¶12) (Miss. 2002). Here the record reflects that Mary took time to consider the matter, discussed it with her family, and agreed to a settlement of the division of the property.

¶37. We find nothing in the record that should have barred the chancery court from accepting the representations of the parties that the matter was settled. Thereafter, Mary filed nothing further with the chancery court to challenge the settlement or seek reconsideration. Accordingly, we find no error in the chancery court's judgment on the division of the parties' assets.

**Conclusion**

¶38. Although Mary waived consideration of the issues she raises on appeal, notwithstanding those waivers, we find no error in the chancery court's judgment of divorce in favor of Glen on the ground of habitual cruel and inhuman treatment or in the court's approval of the parties' agreement to settle the division of their remaining property. Therefore, we affirm the chancery court's judgment of divorce and final judgment regarding equitable division of the parties' assets.

¶39. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**