# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-FC-00827-SCT

*CALEB CRABTREE AND ADRIANE CRABTREE*
*AS ASSIGNEES OF THE CLAIMS OF CASEY*
*COTTON*

*v.*

*ALLSTATE PROPERTY AND CASUALTY*
*INSURANCE COMPANY*

| | |
|---|---|
| ATTORNEYS FOR APPELLANTS: | SAMUEL S. McHARD |
| | P. MANION ANDERSON |
| ATTORNEYS FOR APPELLEE: | GRAFTON ERIC BRAGG |
| | CORY L. RADICIONI |
| | MALLORY M. STREET |
| NATURE OF THE CASE: | CIVIL - FEDERALLY CERTIFIED QUESTION |
| DISPOSITION: | CERTIFIED QUESTION ANSWERED - 05/15/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. The United States Court of Appeals for the Fifth Circuit has asked this Court to answer the following question: "[d]oes Miss. Code Ann. § 97-9-11 (Rev. [2020]) allow a creditor in bankruptcy to engage a disinterested third party to purchase a cause of action from a debtor?" *Crabtree v. Allstate Prop. & Cas. Ins. Co.*, No. 23-60537, 2024 WL 3451894, at *1 (5th Cir. July 18, 2024). This Court finds that the plain language of Mississippi Code Section 97-9-11 (Rev. 2020) prohibits a disinterested third party engaged by a bankruptcy creditor from purchasing a cause of action from a debtor's estate.

## FACTS AND PROCEDURAL HISTORY

¶2. The facts and procedural history are fully detailed in the federal court's opinion. The conflict between Allstate and Caleb and Adriane Crabtree originates from a car collision between Casey Cotton and the Crabtrees. ***Id.*** Caleb was severely injured, and he and Adriane, his wife, filed suit against Cotton and Cotton's insurer, Allstate, on December 10, 2018. It is the Crabtrees' contention that Allstate refused early settlement offers and failed to inform Cotton of the Crabtrees' offers. ***Id.*** The claims against Allstate were eventually dismissed, but the claims against Cotton proceeded in the Lamar County Circuit Court.

¶3. During the pendency of the personal injury suit, Cotton declared bankruptcy. Included in his bankruptcy estate was a potential bad faith claim against Allstate based upon the timing with which liability proceeds were tendered to the Crabtrees. The Crabtrees were unsecured creditors to Cotton's estate and petitioned the bankruptcy court to allow the personal injury suit to proceed to trial. "The [b]ankruptcy [c]ourt directed that the suit in Lamar County Circuit Court against Cotton be liquidated by proceeding to jury trial to obtain a judgment in order to pursue the claims against Allstate for any resulting excess judgment and other damages." ***Crabtree v. Allstate Prop. & Cas. Ins. Co.***, 695 F. Supp. 3d 808, 811 (S.D. Miss. Sept. 2023). The Crabtrees sought an assignment of Cotton's bad faith claim as a settlement of their unsecured claims in Cotton's bankruptcy estate. The trustee agreed to allow the Crabtrees to purchase Cotton's bad-faith claim for $10,000. The Fifth Circuit recounts the facts as follows:

> The Crabtrees, however, could not afford the $10,000 up-front, so they
> engaged Court Properties, L.L.C., to assist with financing. Court Properties

2

paid the bankruptcy trustee $10,000 to acquire the bad-faith claim, then assigned that claim to the Crabtrees in exchange for $10,000 plus interest at 8% with repayment contingent on successful recovery from Allstate.

*Crabtree*, 2024 WL 3451894, at *2.

¶4.     On January 11, 2022, Cotton was discharged from bankruptcy, and on January 19, 2022, a jury verdict in favor of the Crabtrees on the personal injury suit in the amount of $4,605,000 was entered.  *Crabtree*, 695 F. Supp. 3d at 811.  This was in excess of the $25,000 policy limit on Cotton's insurance with Allstate.

¶5.     The Crabtrees filed this action in the United States District Court for the Southern Distict Mississippi on December 22, 2022.  *Id.*

> The district court dismissed that action for lack of subject matter jurisdiction. It held that the assignment of Cotton's claim to Court Properties and Court Properties's assignment to the Crabtrees were champertous and hence void under § 97-9-11.  Thus it found that the Crabtrees lacked Article III standing because absent Cotton's bad-faith claims, the Crabtrees had not suffered any injury at Allstate's hands.

> The Crabtrees appealed, averring that (1) champerty is not available to Allstate as a defense to its suit, or, alternatively, (2) the assignments at issue were not champertous.

*Crabtree*, 2024 WL 3451894, at *1.

¶6.     On appeal, the Fifth Circuit determined that tension exists between the text of Section 97-9-11 and our caselaw that deprived it "of state-court guidance on whether § 97-9-11 voids the assignment in this case."  *Id.* at *5.  Accordingly, the Fifth Circuit certified a question to this Court for an answer.  *Id.*

## CERTIFIED QUESTION

¶7.     Does Section 97-9-11 allow a creditor in bankruptcy to engage a disinterested third

3

party to purchase a cause of action from a debtor?

## STANDARD OF REVIEW

¶8.    Mississippi Rule of Appellate Procedure 20 authorizes the Fifth Circuit to certify a question to this Court when in a proceeding before that court a question or proposition of law arises that may be "determinative of all or part of that cause and there are no clear controlling precedents" in this Court's decisions.  M.R.A.P. 20(a).  "The Supreme Court may, in its discretion, decline to answer the questions certified to it."  *Id.*  If this Court answers the question, it will restrict its review to "[']declaring in general terms the controlling rules' of state law, and not application of law to fact." *Id.* cmt. (quoting ***Boardman v. United Servs. Auto. Ass'n***, 470 So. 2d 1024, 1031 (Miss. 1985)).  The role of this Court is limited to law declaration; fact finding and law application is the responsibility of the fact-finding court, which in this instance is the Fifth Circuit.

## ANALYSIS

¶9.    Mississippi Code Section 97-9-11 (Rev. 2020), is the Mississippi statute that prohibits champerty and maintenance.  It states:

> It shall be unlawful for any person, firm, partnership, corporation, group, organization, or association, either incorporated or unincorporated from this state or any other state, either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise, give, or offer, (b) to receive or accept, or to agree or conspire to receive or accept, (c) to solicit, request, or donate, any money, bank note, bank check, chose in action, personal services, or any other personal or real property, or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court or before any administrative board or other agency, regardless of jurisdiction; provided, however, this section shall not be construed to prohibit the constitutional right of regular

4

employment of any attorney at law or solicitor in chancery, for either a fixed fee or upon a contingent basis, to represent such person, firm, partnership, corporation, group, organization, or association before any court or administrative agency.

Miss. Code Ann. § 97-9-11 (Rev. 2020).

¶10. The Court analyzed this statute in ***Sneed v. Ford Motor Co.***, 735 So. 2d 306 (Miss. 1999). In ***Sneed***, this Court defined champerty as "[a] bargain between a stranger and a party to a lawsuit by which the stranger pursues the party's claim in consideration of receiving part of any judgment proceeds . . . ." ***Id.*** at 309 (alterations in original) (quoting *Champerty*, Black's Law Dictionary (6th ed. 1990)). The Court defined maintenance as "officious intermeddling in a suit which in no way belongs to one, by maintaining or assisting either party, with money or otherwise to prosecute or defend it . . . ." ***Id.*** (alteration in original) (quoting ***State ex rel. Carr v. Cabana Terrace, Inc.***, 247 Miss. 26, 153 So. 2d 257, 259 (1963)). This Court also, however, stated that the terms champerty and maintenance, "have been used by the courts almost interchangeably." ***Id.*** (internal quotation mark omitted) (quoting ***Cabana Terrace, Inc.***, 153 So. 2d at 259).

¶11. Mississippi Code Section 97-9-23 (Rev. 2020) provides exceptions to maintenance. It states in relevant part:

> Nothing in Sections 97-9-11 through 97-9-23 is intended to be in derogation of the constitutional right of real parties in interest to employ counsel or to prosecute any available legal remedy. *The intent*, as herein set out, *is to prohibit and punish, more clearly and definitely, champerty*, maintenance, barratry, and the solicitation or stirring up of litigation, whether the same be committed by licensed attorneys or *by others who are not real parties in interest to the subject matter of such litigation.*

Miss. Code Ann. § 97-9-23 (Rev. 2020) (emphasis added).

5

¶12. The parties spend a considerable amount of their supplemental briefing arguing issues unrelated to the question certified to this Court. The dissent takes the bait and proceeds to answer every imaginable question . . . except the one we were asked. In accordance with this Court's appellate rules, any answer by this Court will only address the legal question asked by the Fifth Circuit, not ancillary arguments or applications of law to fact.[1] M.R.A.P. 20 cmt. (quoting **Boardman**, 470 So. 2d at 1031). Further, this Court is not asked how it would rule on the dispositive issues of this case. Instead, this Court restricts its answer to the question asked by the Fifth Circuit.[2]

¶13. The answer to the certified question is that Section 97-9-11, by its plain language, prohibits a creditor in bankruptcy from engaging a disinterested third party to purchase a cause of action from a debtor. Section 97-9-11 clearly states that it is unlawful for any person to "solicit, request or donate any money . . . as an inducement to any person to commence or to prosecute further . . . any proceeding in any court[.]" Solicitation of a truly disinterested third party to prosecute a case in which it has no legitimate interest would violate the plain terms of Section 97-9-11.

¶14. Pursuant to Section 97-9-23, the maintenance statute does not apply when a real party in interest is seeking to "prosecute any available legal remedy." Accordingly, Section 97-9-

---

[1]We invite the dissent to follow Supreme Court caselaw and the rules of appellate procedure by limiting its answer to questions of law.

[2]In other words, we will not be making any factual determination regarding whether Court Properties, LLC, constitutes a disinterested party nor how its relationship with Crabtree might affect such a determination. Those are issues being decided by the federal court. Further, the federal court does not ask this Court to decide this issue but instead provides us with a scenario in which we are told there is a disinterested third party.

6

23 would not prohibit a real party in interest from procuring funds to continue litigation in which they have a legitimate interest.[3]  This Court has stated that "a party is a 'real party in interest' if it has the legal right under the applicable substantive law to enforce the claim in question[.]" **Sneed**, 735 So. 2d at 313 (internal quotation marks omitted) (quoting *Real Party in Interest*, Black's Law Dictionary (6th ed. 1990)).  The disinterested third party in the Fifth Circuit's question would not be a real party in interest (hence, the term *disinterested*), and thus the purchase of the cause of action would not qualify under the stated exception of Section 97-9-23 as the pursuit of any legal remedy by a real party in interest.[4]  Again, engaging a truly disinterested third party to purchase a cause of action in which they have no legitimate interest would be champerty.

¶15.    In **Sneed**, the Court was tasked with determining whether a settlement agreement between United States Fire Insurance Company and National Union Fire Insurance Company

---

[3]As we understand the facts, for reasons that are not before us, Crabtree chose not to borrow funds from Court Properties, LLC, to purchase the claim.  Rather, they solicited Court Properties, LLC, to actually purchase the claim.  Court Properties, LLC, however briefly, apparently became the owner of the claim.  These facts are relevant because this federal question only exists because Allstate contends that "the transaction became infected with champerty and maintenance when the Crabtrees invited an outsider to buy the claim, assign it to them, and receive repayment and interest rights from future lawsuit proceeds." The federal court has already found that "if the Crabtrees had purchased the bad-faith claim directly, the assignment would likely not have been champertous under **Sneed**." **Crabtree**, 2024 WL 3451894, at *4.  According to the parties and the federal court, it is Court Properties' brief ownership that raises the issue of champerty.

[4]To address the dissent's concern with an overly simplified answer, we specifically disclaim any finding about third-party funding of litigation.  Diss. Op. ¶ 55. That would require factual scenarios not before this Court and would expand this opinion to advisory. **Tunica Cnty. Democratic Exec. Comm. v. Jones**, 233 So. 3d 792, 797 (Miss. 2017) ("This Court does not issue advisory opinions." (citing **Hughes v. Hosemann**, 68 So. 3d 1260, 1263 (Miss. 2011))).

7

(collectively, the Insurers) and the plaintiffs, who were injured guest passengers in the vehicle driven by the insured, was champertous. *Sneed*, 735 So. 2d at 307. The terms of the settlement agreement were that the Insurers would pay their policy limits and all expenses of prosecuting an action against Ford Motor Company, and, in exchange, the plaintiffs would sue Ford and share the proceeds of the action with the Insurers. *Id.* at 307-08. The terms of the settlement agreement were discovered by Ford, and the trial court found that the settlement violated Mississippi's prohibition on champerty and maintenance. *Id.* at 308.

¶16. The plaintiffs appealed to this Court. This Court found that "the ultimate disposition of the questions before the Court" depended on "whether the Insurers here have a real and legitimate interest in the individual plaintiffs' claims against Ford[.]" *Id.* at 311. The Court found that "at the time of the settlement here the Insurers and their insureds had a real and substantial interest in the allocation of responsibility among the plaintiffs and all potential defendants." *Id.* at 313. The Court ruled that "agreements with potential defendants who have a legitimate interest in the allocation of responsibility should not be declared champertous." *Id.* at 314.

¶17. Returning to the certified question, the answer to the certified question aligns with this Court's caselaw. *Sneed*'s analysis of Section 97-9-23, to determine who would be a real party in interest under the statute, only aids in showing that a disinterested third party is not a real party in interest. A disinterested third party, under *Sneed*, is one who has no real or legitimate interest in the litigation, "as distinguished from one who has only a nominal, formal, or technical interest in or connection with it." *Id.* at 313 (quoting *Real Party in*

8

*Interest*, Black's Law Dictionary (6th ed. 1990)). The facts of this case, as they pertain to the meaning of the statute or any similarities to *Sneed*, are not a proper consideration for this Court on a certified federal question. We make no decision as to whether we would come to the same conclusion as the federal court on the factual determinations or as to whether Court Properties, LLC, was a disinterested third party. Further, we will not decide the ultimate outcome of this case.

¶18. Section 97-9-11 remains a binding statute enacted by our legislature. The parties have not shown any reason to question the enforceability or constitutionality of Section 97-9-11. This statute would clearly prohibit the actions described in the certified question. This Court does not "broaden or restrict a legislative act[,]" and when the "statute's language is clear and unambiguous, we apply its plain meaning[.]" *Watson v. Oppenheim*, 301 So. 3d 37, 41 (Miss. 2020) (internal quotation mark omitted) (quoting *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011)).

¶19. Bankruptcy rules are not relevant to the answer of the certified question because the issue must be resolved according to our Mississippi maintenance statutes.[5] *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 451, 127 S. Ct. 1199, 167

---

[5]The dissent incorrectly creates arguments for the parties under the bankruptcy proceedings. Dissent Op. ¶¶ 60-64. These arguments were not raised in the appellate briefs, the federal court opinions, or the certified question. This Court does not "advocate for one party to an appeal" and does not address issues not briefed on appeal. *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (Miss. 2018) (internal quotation mark omitted) (citing *Jefferson v. State*, 138 So. 3d 263, 265 (Miss. Ct. App. 2014)). Even if we share the dissent's sympathy with the Crabtrees' situation, the dissent's considerations are irrelevant to the question before this Court and fly in the face of the Court's rules. The dissent quixotically tilts at these windmills, setting up and knocking down one straw man after another. In reality, the dissent merely provides solutions that are looking for problems.

L. Ed. 2d 178 (2007) ("'[p]roperty interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." (quoting **Butner v. United States**, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 136 (1979))); *see also* **In re MacDonald**, 326 B.R. 6, at *10 (Bankr. D. Mass 2005) (evaluating Massachusetts law on assignability of a personal injury claim to determine if the claim was exempt in bankruptcy court). We assume that the Fifth Circuit's question was framed in the context of bankruptcy to reference the Fifth Circuit's determination that "[t]he Crabtrees have a real and legitimate interest in Cotton's bad-faith claim as creditors of Cotton's bankruptcy estate." **Crabtree**, 2024 WL 3451894, at *4. The Crabtrees' interest in Cotton's estate is not, however, a question before this Court.

**CONCLUSION**

¶20.    Section 97-9-11 prohibits a creditor in bankruptcy from engaging a disinterested third party to purchase a cause of action from a debtor.

¶21.    **CERTIFIED QUESTION ANSWERED.**

**COLEMAN, P.J., MAXWELL, GRIFFIS AND BRANNING, JJ., CONCUR. RANDOLPH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., ISHEE AND SULLIVAN, JJ.**

**RANDOLPH, CHIEF JUSTICE, DISSENTING:**

¶22.    The answer to the Fifth Circuit's question is **YES**. Criminal statutes only prohibit what is expressly barred by the text, and the words "disinterested third party" do not exist in Mississippi Criminal Code Section 97-9-11 (Rev. 2020). Nor can the words be inferred from

10

the statute. The concept of interest or disinterest is simply completely absent from the text or implications of Section 97-9-11.

¶23. It is bedrock law that the legislature writes laws, and the judiciary interprets them. This Court does not have the authority to add words to statutes, and to do so violates the constitutionally mandated separation of powers. "No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others." Miss. Const. art. 1, § 2. Section 97-9-11 criminalizes the offering something of value "as an inducement" to litigate. If there is no inducement, there is no crime. The Fifth Circuit's words "disinterested third party" have nothing to do with the text of the statute, and when the majority accepts the addition of three words to the statute, there is a violation of the constitutionally mandated separation of powers.

¶24. Charity—not champerty—is at the heart of this case. As will be discussed *infra*, Mark Gibson's[6] act of selfless concern for the well-being of Caleb and Adriane Crabtree was not a champertous act. The settlement agreement[7] was transparent and in accordance with the law. After negotiations between the Crabtrees, Casey Cotton, and their counsel, both of whom are Mississippi attorneys, the bankruptcy trustee, also a Mississippi attorney who initiated settlement discussions, filed the agreement in the United States Bankruptcy Court for the Southern District of Mississippi. The bankruptcy judge, Katherine Samson, also a Mississippi attorney, then approved the agreement and signed an order. **ORDER**

---

[6]Mark Gibson was the manager and owner of Court Properties Real Estate Company, LLC. The members were Resurrection Life Ministries, Inc., and Haybren Land & Cattle Co.

[7]*See* Appendix A.

11

**APPROVING SETTLEMENT AND COMPROMISE OF DISPUTES AND TO APPROVE ASSIGNMENT OF BAD FAITH CLAIM**. This authorized and directed the trustee and the Crabtrees to execute the settlement agreement. In oral arguments before this Court, Allstate described these actions as criminal.

¶25. Mark Gibson did not violate Section 97-9-11. Nothing in the record suggests anything other than that this was an act of a Good Samaritan. Despite Allstate's statement to the contrary in oral arguments, being a Good Samaritan in this case was not a crime.

## I. Statutory Construction

¶26. Criminal statute, Mississippi Code Section 97-9-11, titled Champerty and maintenance; solicitation and stirring up of litigation prohibited, located in Chapter 9. Offenses Affecting Administration of Justice, of Title 97 Crimes, codifies common law champerty. The section actually incorporates some of the crime's origins.

¶27. Champerty and maintenance have been illegal in the common law since medieval times. *See infra* ¶ 38. They have always included the elements of "officious intermeddling" and the "stirring up of litigation." **Sneed v. Ford Motor Co.**, 735 So. 2d 306 (Miss. 1999) (quoting **State ex rel. Carr v. Cabana Terrace, Inc.**, 247 Miss. 26, 153 So. 2d 257, 259 (1963)); *see also* 14 Am. Jur. 2d *Champerty, Maintenance, Etc.* § 1 Westlaw (database updated Jan. 2025); 14 C.J.S. *Champerty and Maintenance* § 1 Westlaw (database updated Dec. 2024). The Corpus Juris Secondum defines officious intermeddling as: "Officious intermeddling, as a necessary element of champerty, is offering unnecessary and unwanted advice or services or being meddlesome in a high-handed or overbearing way." 14 C.J.S.

12

*Champerty and Maintenance* § 1 (footnote omitted) (citing **Kraft v. Mason**, 668 So. 2d 679 (Fla. DCA 1996)). These common law elements of officious intermeddling and stirring up of litigation are preserved in the statute by the requirement that the transfer of value act "as an inducement" to continue or begin litigation. Miss. Code Ann. § 97-9-11. Therefore, disinterested third parties purchasing a cause of action from a debtor, which *does not induce litigation* as result of that purchase, would *not* be criminalized by the precise language of Section 97-9-11.

¶28. As with all statutory construction, we begin with the text. Furthermore, we must adhere to the rule that "[i]t is bedrock law in Mississippi that criminal statutes are to be strictly construed[.]" **Coleman v. State**, 947 So. 2d 878, 881 (Miss. 2006) (citing **McLamb v. State**, 456 So. 2d 743, 745 (Miss. 1984)). Criminal statutes must be read narrowly, not broadly.

¶29. The Fifth Circuit's certified question described Section 97-9-11 as a "verbose and difficult to construe" statute. **Crabtree v. Allstate Prop. & Cas. Ins. Co.**, No. 23-60537, 2024 WL 3451894, *1 (5th Cir. July 18, 2024). I agree. Hopefully, breaking down the statute into its component parts will assist all. The crime prohibited by the statute can be reduced to four essential elements:

*Element 1*:

> It shall be unlawful for any person, firm, partnership, corporation, group, organization, or association, either incorporated or unincorporated from this state or any other state, either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise, give, or offer, (b) to receive or accept, or to agree or conspire to receive or

13

accept, (c) to solicit, request, or donate . . .

**Restated:** A person or entity gives, receives, or solicits

*Element 2*:

any money, bank note, bank check, chose in action, personal services, or any other personal or real property, or any other thing of value, or any other assistance . . .

**Restated:** anything of value

*Element 3*:

*as an inducement*

**Restated:** but for the value transfer, the parties would not want to bring suit

*Element 4*:

to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court or before any administrative board or other agency, regardless of jurisdiction[.]

**Restated:** to bring or continue litigation.

¶30. Answering the certified question with these elements in mind, the answer can only be **YES**. Absent inducement to litigate, there is no crime.

*The Inducement Element*

¶31. The inducement element's importance is even more clearly shown by its central inclusion in two companion affidavit statutes: Mississippi Code Sections 97-9-15 and -17 (Rev. 2020). These sections allow a party or the court *sua sponte* to require that opponents

14

sign affidavits swearing they are not in a champertous agreement.[8] The affidavits specifically disavow having committed the crime found in Section 97-9-11. The affidavit from Mississippi Code Section 97-9-15 reads in relevant part:

> . . . I have neither received, nor conspired to receive, any valuable consideration or assistance whatever *as an inducement* to the commencement or further prosecution of the proceedings in this matter.

Miss. Code Ann. § 97-9-15 (Rev. 2020) (emphasis added). Inducement is central.

¶32. The affidavit found in Mississippi Code Section 97-9-17 applies to the attorney representing the party and reads in relevant part:

> neither I nor, to the best of my knowledge and belief, any other person, firm, partnership, corporation, group, organization, or association has promised, given, or offered, or conspired to promise, give, or offer, or solicited, received, or accepted any valuable consideration or any assistance whatever to said (_____) *as an inducement* to said (_____) to the commencement or further prosecution of the proceedings herein.

Miss. Code Ann. § 97-9-17 (Rev. 2020) (emphasis added). Once again, inducement is central. These affidavits swear that affiant did not commit the crime forbidden in companion statute, Section 97-9-11. Inducement is central to the affidavit statutes' purposes because it is central to the crime.

### *Mark Gibson did not induce the Crabtrees*.

¶33. Mark Gibson did not purchase the cause of action to induce the Crabtrees to sue. Gibson, as shown by his affidavit, facilitated the Crabtrees' acquisition of the cause of action

---

[8]In ***Sneed***, the Mississippi attorneys involved refused to sign the court ordered affidavits, which led to the interlocutory appeal. ***Sneed***, 735 So. 2d at 308. In today's case, nothing in the record indicates that Allstate ever asked the Crabtrees or their attorneys to sign the affidavits from Sections 97-9-15 and -17.

"solely as a way to assist a young family that was in a terrible situation due to the motor vehicle collision[.]" He had no intent to induce. The purchase was not a profit seeking venture by Gibson. He only stood to recover $10,000 (the amount of the purchase) plus 8 percent interest[9] and only *if* the Crabtrees themselves recovered a minimum of $100,000 from Allstate. There was no inducement. No one participated in stirring up litigation or officiously intermeddling.

¶34. Importantly and *clearly* from the Fifth Circuit's record, the Crabtrees were not induced to litigate by the purchase. The Fifth Circuit's record reveals that the Crabtrees had already brought suit against Allstate in this matter twice before.[10] The previous litigation reveals that an unambiguous prior intent to pursue litigation was already present. The Crabtrees were not induced to bring suit by Gibson's purchase.

¶35. Section 97-9-11 criminalized the inducement of litigation to prevent "officious intermeddl[ers]" seeking to profit from abusing the judicial system and stirring up litigation which parties do not truly want to pursue. *Cabana Terrace, Inc.*, 153 So. 2d at 259 (quoting 10 Am. Jur. *Champerty and Maintenance* § 1). Section 97-9-11 is a crime against the administration of justice. Our judicial system is not a no-holds-barred arena for gamblers and

---

[9]Eight percent interest is the statutorily prescribed interest rate. Miss. Code Ann. § 75-17-1 (Rev. 2016) (" The legal rate of interest on all notes, accounts and contracts shall be eight percent (8%) per annum, calculated according to the actuarial method, but contracts may be made, in writing, for payment of a finance charge as otherwise provided by this section or as otherwise authorized by law.").

[10]*Crabtree v. Allstate Prop. & Cas. Ins. Co.*, No. 1:21 CV 399 TBM BWR, 2022 WL 17813701 (S.D. Miss. Dec. 19, 2022); *Crabtree v. Cotton, State Farm Mut. Auto. Ins. Co., Allstate Prop. & Cas. Ins. Co., and John Does 1–5*, No. 37:18cv119 (Lamar Cnty., Miss., Cir. Ct. 2019).

hustlers to traffic in lawsuits in pursuit of personal profit. The prevention of interloping profiteers from stirring up litigation that otherwise would not be brought is inherent to champerty and is preserved in the statutes by the required inducement. Inducement directly addresses the historical and continuing definition of the crime.

*The History of Champerty*

¶36. The text of the statute answers the question from the Fifth Circuit. But there is more. The text of Mississippi Code Section 97-9-23 (Rev. 2020) includes an explicit statement of the legislature's intent to ban the common law crimes of champerty and maintenance. Section 97-9-23 reads, "[t]he intent, as herein set out, is to prohibit and punish, more clearly and definitely, champerty, maintenance, barratry, and the solicitation or stirring up of litigation[.]" Miss. Code Ann. § 97-9-23 (Rev. 2020).

¶37. The historical justification for disallowing champerty can be found in *Sneed*. "The historical condemnation of champerty and maintenance is grounded in the estimable purpose of preventing the *marketing of lawsuits* where the parties might, but for the commerce in claims reach an amicable or at least mutually satisfactory settlement." *Sneed*, 735 So. 2d at 314 (emphasis added). The marketing or trafficking of lawsuits by officious intermeddlers is at the core of champerty.

¶38. *Sneed*'s historical analysis is supported by other jurisdictions. The Supreme Court of Minnesota summarized the origins of champerty and maintenance laws:

In medieval England, those with means played "the game of writs" to increase

17

their power and harass their rivals[11] through the medieval court system. R. D. Cox, *Champerty as We Know It*, 13 Mem. St. U. L. Rev. 139, 142 (1983). Part of this practice included the maintenance by a lord of a lawsuit against a landowner in exchange for a share of the proceeds of land. *Id.* at 143–44.

To address this problem, English statutes and common law prohibited third parties from taking a financial interest[12] in litigation. *Id.* at 153–54. The law against champerty explains the early prohibitions against assignment of claims and against contingency fees for attorneys in both England and the United States, because both practices were seen as champertous. [Max Radin, *Maintenance by Champerty*, 24 Calif. L. Rev. 48, 68–70 (1935)].

*Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 237 (Minn. 2020). Since their arrival, champerty laws have existed to prevent the abuse of the legal system by speculators and profiteers seeking to advance their own interests by inducing litigation that otherwise would not have been brought.

¶39. In 1929, Benjamin Cardozo, respected jurist and chief judge of the New York Court of Appeals, wrote about the essence of the law of champerty and maintenance. In *In re Estate of Gilman*, he wrote:

Even [in England which has stronger champerty laws] the maintenance *inspired by charity or benevolence*[13] has been sharply set apart from maintenance for spite or envy or the promise or hope of gain[14]. 'It seems to be agreed, that anyone may lawfully give money to a poor man to enable him

---

[11]Mark Gibson did not "increase [his] power" or "harrass [his] rival" in the case sub judice, much less "play the game of writs."

[12]Mark Gibson did not further his "financial interest" in the case sub judice. He merely sought to be repaid $10,000 plus statutory interest. And that is only *if* the Crabtrees recover at least $100,000 from Allstate.

[13]Mark Gibson did indeed act out of "charity or benevolence," as the record clearly demonstrates.

[14]Mark Gibson did not act out of "spite or envy or the promise or hope of gain."

18

to carry on his suit'

*In re Est. of Gilman*, 251 N.Y. 265, 270 (1929) (emphasis added) (quoting 1 Hawkins, *Pleas of the Crown*, ch. 27(6), § 26, p. 460)). The benevolent charity in this case is *not* champerty.

## II. Mississippi Supreme Court Caselaw

¶40. The requirement of officious intermeddling or stirring up of litigation is also supported by Mississippi caselaw. Section 97-9-11 has never been used to prosecute a crime and, although there is an admitted paucity of Mississippi case law regarding champerty, the few cases which this Court *has* considered provide more than adequate guidance for determining what constitutes champertous conduct. But it bears repeating that Section 97-9-11 has not resulted in a single criminal conviction reported in Mississippi.

¶41. In *Calhoun County v. Cooner*, 118 So. 706, 707 (Miss. 1928), Cooner was seeking payment of a disputed portion of his salary as county clerk. Calhoun County had argued that because a public accountant informed Cooner of the potential to recover his salary and offered to help recover it in exchange for a percent of the recovery, the agreement was champertous and therefore could not be prosecuted. *Id.* The trial court granted a demurrer on the issue in Cooner's favor, and Calhoun County appealed. *Id.* On appeal, this Court said it "th[ought] the trial court was right" but declined to rule on the nature of the arrangement, instead holding that it was irrelevant because "a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney, or between plaintiff and another layman, in no wise affects the obligation of the defendant to the plaintiff." *Id.* (quoting 11 C. J. § 2). This Court shunned the defendant's attempt to avoid accountability by alleging

a champertous arrangement between the plaintiff and another[15] and affirmed the demurrer.

¶42.   But Calhoun County was not done yet.  It then filed a suggestion of error arguing that this Court was contradicting its precedent because it had previously condemned as champertous the transfer of "an interest in a disputed claim to certain slaves" in ***Rives v. Weaver***, 36 Miss. 374 (1858).  ***Cooner***, 118 So. at 707.  This Court cited the importance of the passage of an intervening statute Chapter 134, Laws of 1916, which it quoted:

> "In case of a transfer or an assignment of any interest in such chose in action before or after suit brought, the action may be begun, prosecuted and continued in the name of the original party, or the court may allow the person to whom the transfer or assignment of such interest has been made, upon his application therefor, to be substituted as a party plaintiff in said action."

***Id.*** (quoting Hemingway's 1927 Code § 511).  Indeed, the Court acknowledged that this statute changed the law in Mississippi.  And that "[u]nder this statute [disinterested third party accountant] Smith had the right to make the contract with Cooner, and the suit could be prosecuted in the name of the latter."  ***Id.*** at 708.  The language of this statute quoted above *still exists, verbatim*, in Mississippi Code Section 11-7-3 (Rev. 2019).

¶43.   When this Court decided ***Fry v. Layton***, 2 So. 2d 561 (Miss. 1941), Mississippi had very strict usury laws.  *See* Miss. Code (1930) ch. 37.  At the time, if a plaintiff could prove that a lender had charged more than 20 percent on a loan, the lender would have to forfeit both the full amount of the loan and the interest of the loan as his penalty.  ***Id.*** § 1946. Layton took out two loans from Fry at a usurious rate.  ***Fry***, 2 So. 2d at 562-63.  After paying back his usurious loans, Layton purchased, for the nominal amount of one dollar each, the

---

[15]This is precisely what Allstate is doing now.

20

notes and the "rights of such borrowers growing out of these loans" of eighteen other borrowers who had also paid Fry back at an usurious rate of interest.[16] *Id.* at 562. Layton then proceeded to sue Fry for usury on all the notes. *Id.* In the trial court, he prevailed and was awarded the entire amount of all the loans and the interest paid on them. This Court described his conduct as "a profitable business indeed[.]" *Id.* at 565. We held Layton's actions to be a "champertous business of gathering up these claims for a nominal consideration" and reversed the judgment of the trial court. *Id.* This case provides an excellent example of the type of officious intermeddling, stirring up of litigation, and trafficking in lawsuits that the statute prohibits. In contrast with *Fry*, here, there is only one cause of action, purchased for much more than a nominal amount, for the benefit of a party already injured, with approval of the bankruptcy court, and with notice to the world. That does not amount to public-policy-threatening officious intermeddling which the statute criminalizes.

¶44.   In 1999, this Court decided the seminal case on Mississippi Code Section 97-9-11. *Sneed*, 735 So. 2d at 315. In *Sneed*, William Hough, along with several passengers, including Lori Sneed, was driving a Ford Bronco when it rolled over and caused extensive injuries to all inside. *Id.* at 307. The Bronco was insured by United States Fire Insurance Company and National Union Fire Insurance Company (Insurers), which entered a settlement agreement with Sneed and the other injured parties. When Sneed filed suit against Ford Motor Company, the trial court determined that "[i]t would appear from the 'agreement' that

---

[16]Allstate conceded at oral argument that Mark Gibson's payment was not a nominal amount.

21

the current action violates the laws of this State which prohibit champerty and maintenance

. . . ." *Id.* at 308 (second alteration in original).

¶45. The disclosed terms of the agreement included:

(1) The Insurers must pay $5,000,000 to the insureds.

(2) The insureds must file suit against Ford Motor Company.

(3) The Insurers must pay the litigation expenses of the insureds.

(4) Upon successful recovery of damages under the suit, the Insurers would be reimbursed for their expenses, then the law firm would receive 15 percent, then the Insurers and insureds would split the remaining proceeds until the Insurers recovered $5,000,000.

*Id.* at 307-08. The circuit court further noted that "[t]he individual Plaintiffs have absolutely no control of the litigation, nor do they have any financial investment nor interest in the success of the litigation until all expenses including attorney fees have been deducted." *Id.* at 308.

¶46. On appeal to the Mississippi Supreme Court, this Court found "that the agreement at issue constitutes a valid and enforceable assignment[.]" *Id.* at 311. This Court considered the general definition of champerty and noted that "Champerty is a species of maintenance and that term and 'maintenance' have been used by the courts almost interchangeably." *Id.* at 309 (internal quotation marks omitted) (quoting *Cabana Terrace, Inc.*, 53 So. 2d at 259). Then the Court continued:

Perhaps the best, because it is the most flexible, definition of maintenance is that it is an *officious intermeddling* in a suit which in no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it . . . .

22

*Id.* (emphasis added) (quoting ***Cabana Terrace, Inc.***, 53 So. 2d at 259). In ***Sneed***, this Court found that a $5,000,000 settlement agreement did not constitute officious intermeddling and validated the settlement agreement.[17]

¶47. The Court held that "[t]his is not the kind of trafficking in lawsuits that the common law of champerty was designed to forbid" before concluding that "[w]e find that the Plaintiffs did not bring their action due to inducement by or assistance from the Insurers." *Id.* at 313-14.

¶48. Then the Court repeated the law as written nearly one hundred years before in ***Cooner***, holding:

> most importantly, whether or not the subject agreement is champertous is not a defense to Ford. . . .["]the fact that there is a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney, or between plaintiff and another layman, in no wise affects the obligation of defendant to plaintiff.["]

***Sneed***, 735 So. 2d at 314-15 (quoting ***Cooner***, 118 So. at 707). ***Sneed*** clearly stands, *inter alia*, for the proposition that Mississippi Code Section 97-9-11 only bans officious assignments which act as an inducement to stir up litigation.

¶49. The majority erroneously opines that its "answer to the certified question aligns with this Court's caselaw." Maj. Op. 17. Respectfully, I disagree. The majority analyzes ***Sneed*** to argue that a disinterested third party may not be engaged by a creditor to purchase a cause of action from a bankruptcy proceeding. In ***Sneed***, there was no champerty just as in the case today there is no champerty.

---

[17]If the question today read, "was the bankruptcy approved settlement agreement consistent with Mississippi law," no question that it was then, and it is today.

23

¶50.  In *Sneed*, the agreement before the Court explicitly required the insureds to sue Ford Motor Company in exchange for $5,000,000 from the Insurers.  *Sneed*, 735 So. 2d at 307. The agreement sub judice has no such requirement.  In *Sneed*, the Insurers had total control of the litigation, including choice of attorneys.  *Id.* at 308.  The Crabtrees retain control of this litigation and their choice of attorney.  In *Sneed*, the expenses of the litigation were to be paid back to the Insurers before any other damages were distributed.  Such a provision is not in today's record.  In *Sneed*, the "remaining proceeds would be evenly divided between the Insurers and the Plaintiffs until the Insurers had recovered the $5,000,000 paid to the Plaintiffs under the settlement agreement. Finally, the remainder of the proceeds would go to the Plaintiffs for their division."  *Id.* at 307-08.  Here, Mark Gibson only gets repaid $10,000 plus statutory interest if the Crabtrees recover at least $100,000.

¶51.  As the agreement in *Sneed* was not champertous, certainly the charitable loan sub judice is not either.  The logical contradiction is irreconcilable.  But the answer is clear—neither transaction is champertous because neither transaction involves trafficking in lawsuits, speculative profiteering off the judicial system, marketing lawsuits, officious intermeddling, stirring up litigation, or similar activities.

### III.    Allstate's Absurd Application of the Statute

¶52.  At oral argument, Allstate admitted that its application of Mississippi Code Section 97-9-11 prevents Good Samaritans from helping people out of kindness.

> Chief Justice: So nobody in the world could be a Good Samaritan, according to your position, and give [the Crabtrees] money to continuing the litigation?

> Allstate: Under the statute, that is my answer. If it meets the criteria for the

24

statute, that is correct. And I will say, I don't know if that's a good result, a bad result as far as the public policy ramifications.

That application of this statute is absurd and not founded on the plain text of Mississippi Code Section 97-9-11. Allstate's interpretation, which prohibits charitable acts of kindness is preposterous, against expressed public policy,[18] and incongruent with the Court's prior holdings.

¶53. Allstate alleges that it would be a crime for a bank or credit union to loan the Crabtrees money to pursue their case. As there is no *knowingly* requirement in Section 97-9-11, according to Allstate, a bank could give out a loan, which the recipient then would use to pursue litigation completely unbeknownst to the bank. Yet the lender would be guilty of a felony punishable by one year in prison.

¶54. Allstate even went so far as to argue that the bankruptcy trustee was guilty of a felony. A trustee, working in good faith, to further the best interests of the estate she represented is now, according to Allstate, guilty of a crime. This is not what the statute says, and it is not what the crime codified in Section 97-9-11 has ever sought to forbid.

*Effects of the Majority's Certified Answer*

¶55. The majority's answer to the Fifth Circuit's question will have widespread ramifications. One common assignment that today's answer would immediately make a crime is the sale of debt. In our banking system, lenders often sell their clients' debt. These sales are assignments of chose of actions. Such actions allow financial institutions to

---

[18]The legislature has exhibited a clear public policy favoring giving. Mississippi's tax code alone is rife with examples.

facilitate available loans for businesses and individuals alike. In **_Garrett v. Gay_**, this Court defined _chose of actions_ as

> the right of bringing an action, or a right to recover a debt or money, or a right of proceeding in a court of law to procure the payment of a sum of money, or a right to recover a personal chattel or a sum of money by action, or, as it is defined by statute, a right to recover money or personal property by a judicial proceeding.

**_Garrett v. Gay_**, 394 So. 2d 321, 322 (Miss. 1981) (quoting 73 C.J.S. _Property_ § 9 (1951)).

When a debt is sold, it is the right to recover the debt that is transferred—a chose in action.

The majority's answer criminalizes any financial institution that was not a party to the initial loan agreement purchasing debt because they would be a disinterested third party.

¶56.    Almost all student loans are transferred at some point in the loans' life. Each of these transfers is an assignment to a disinterested third party. And each of these assignments would be void under an erroneous interpretation of the statute. Were this to become the law of Mississippi, every indebted student could refuse to pay their loan and when pursued in court, simply declare that the assignment of their loan was void and therefore the party seeking collection had no standing to sue.

¶57.    Every patient who signs in to a hospital or medical office executes documents that assign his rights to sue his insurance company in order to recover payment. The providers were not a part of the insurance contract that he signed with his insurance company. Under this interpretation, even routine medical assignments would become criminal. Such an absurd reading of the statute would undoubtedly lead to extensive litigation whenever any

claim is brought subsequent to an assignment.[19]

### IV.    Scope of Review

¶58.    In inviting this Court to answer its certified question, the Fifth Circuit expressly "disclaim[ed] any intention or desire that [we] confine [our] reply to the precise form or scope of the question certified." **Crabtree**, 2024 WL 3451894, at \*5.  Evaluating the full record, the following facts of the case are helpful to understanding the Fifth Circuit's dilemma.

*In the Matter of Casey James Cotton, Debtor. Allstate Insurance Company, Interested Party.  Case No. 21-50399-KMS.*

¶59.    Casey Cotton filed bankruptcy on March 31, 2021.  When the bankruptcy's automatic stay of litigation against Cotton expired, on May 5, 2021, the Crabtrees filed their Motion to Authorize Crabtree Lawsuit to Proceed in State Court.  The Crabtrees were diligently pursuing their claims well before the allegedly criminal settlement agreement was entered into.

¶60.    Allstate was an interested party to the bankruptcy proceedings at least as early as May 27, 2021.  On that day, Allstate filed a protective motion with the bankruptcy court.  Allstate received notice of all filings that transpired.  So when, on September 13, 2021, Bankruptcy Trustee Kimberly Lentz filed the Trustee's Motion to Approve Compromise or Settlement under Rule 9019, Motion For Sale of Property under Section 363(b) *Approve Assignment of Bad Faith Claim*, seeking court approval of the settlement agreement, Allstate received

---

[19]At oral argument, Justice Griffis questioned Allstate's counsel regarding whether this case is about third party litigation funding.  He answered no.  Whatever the Fifth Circuit decides, today's case is not about third party litigation funding.

electronic notice. There was a twenty-one day period allotting time for filing written objection or response. Allstate did neither.[20]

¶61. This bankruptcy court approved settlement agreement noted that "Cotton . . . has a potential bad faith claim against Allstate Insurance Company" and that the claim "is property of Cotton's bankruptcy estate and the Trustee has sole authority to pursue or *otherwise administer* the Bad Faith Claim." (Emphasis added.) It continued, "Cotton and Crabtree have agreed to settle their disputes and, as a part of the settlement, the Trustee has agreed to assign the Bad Faith Claim to Crabtree or his designee, all on the terms contained herein." Finally, the approved agreement declared explicitly, "The Trustee will sell and assign the Bad Faith Claim to Crabtree's designee, Court Properties, Inc., P.O. Box 1, Picayune, MS 39466, for the sum of $10,000.00."

¶62. Allstate was given twenty-one days to file an objection to the settlement agreement, but *it did not*. Far be it for me to rule on a federal bankruptcy court proceeding, but was it not improper for the district court to consider an issue to which Allstate failed to timely object as a party to the bankruptcy proceedings in that same district?

¶63. It is longstanding judicial policy of Mississippi that settlement agreements are favored in the law. "We begin with an acknowledgment of the general premise that compromise reached by way of mediation or otherwise, is favored in the state of Mississippi. Moreover, the law favors the settlement of disputes by agreement of the parties and, ordinarily, will

---

[20]I do not know why any debate did not end then. The record reveals that a United States bankruptcy court issued a legally binding order, of which Allstate was on notice, and Allstate neither objected nor filed an appeal.

enforce the agreement which the parties have made[.]" *Chantey Music Publ'g, Inc. v. Malaco, Inc.*, 915 So. 2d 1052 (Miss. 2005) (citing *Hastings v. Guillot*, 825 So. 2d 20, 24 (Miss. 2002)).

¶64. A bankruptcy court judge approved the settlement agreement entered into by the bankruptcy trustee, Cotton, the Crabtrees, and their designee, Mark Gibson, all of whom came together in a meeting of the minds and all of whom gave up something of value in exchange for something of value. Allstate was on notice of the contents of the settlement agreement and had twenty-one days in which to file an objection. It is irresponsible to invalidate an agreement legally formed in good faith as a result of this unwarranted attack by a party who could have objected in the first place but declined.

### V. Conclusion

¶65. Let us never forget that unintended consequences can occur. If a credit union provides a loan to a similarly situated unfortunate family, will the credit union be subjected to accusations of committing the crime of champerty? If Adriane Crabtree's father had given his daughter and son in law the money, would he have been committing a crime? Would a bank, credit union, savings and loan, or any other lending institution be prevented from selling the right to recover the debt of one of their defaulted clients lest they be found guilty of a crime?

¶66. The words "disinterested third party" do not appear in Section 97-9-11. Nor do they appear in the sister statutes Sections 97-9-15 or -17. The statute codifies the crime of champerty and requires officious intermeddling to be present via the inducement element of

29

the crime. All of this Court's precedent indicates that the assignment in the case sub judice did not violate Mississippi law.

¶67. Interpreting Section 97-9-11 by adding three words as the majority's answer does, transforms charity into criminality. That is not how the statute reads, and it is not what the law should do. The legislature did not criminalize compassion. The statutory text, the common law tradition, and the public interest all point in the same direction: the assignment was lawful, and the Crabtrees deserve their day in court.

**KING, P.J., ISHEE AND SULLIVAN, JJ., JOIN THIS OPINION.**

### SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by and among Casey James Cotton, Debtor ("Cotton"), Caleb and Adriane Crabtree (collectively "Crabtree") and Kimberly R. Lentz, in her capacity as Chapter 7 Trustee ("Trustee") for the bankruptcy estate of Casey James Cotton, Case No. 21-50339 KMS, United States Bankruptcy Court for the Southern District of Mississippi ("Bankruptcy Court"), The Trustee, Cotton and Crabtree may sometimes be referred to herein individually as a "Party" or collectively as the "Parties".

### RECITALS

A.     In September of 2018, Crabtree and Cotton were involved in a motor vehicle accident that resulted in severe injuries to Crabtree.   Crabtree filed a civil action styled Caleb Crabtree and Adriane Crabtree v. Casey Cotton and John Does 1-5, Civil Action 37:18-cv-119,  Lamar County Circuit Court ("Negligence Lawsuit").

B.     Cotton filed for relief under Chapter 7 of the Bankruptcy Code on March 31, 2021 ("Cotton Bankruptcy Case"). Crabtree is an unsecured creditor in the Cotton Bankruptcy Case by virtue of the motor vehicle accident the Negligence Lawsuit.

C.     On May 5, 2021 Crabtree filed a Complaint Objecting to Discharge and to Dismiss against Cotton KMS (Dkt # 23, Adv. P. 21-06008) ("Discharge Complaint").

D.     On May 19, 2021, Crabtree filed an Objection to Exemptions (Dkt# 71) and on June 15, 2021 the Bankruptcy Court entered an Order (Dkt# 127) allowing certain exemptions and holding the matter in abeyance with regard to other exemptions pending further discovery ("Objection to Exemptions").

E.     On June 29, 2021, Cotton filed a Motion for Sanctions (Dkt# 154) against counsel for Crabtree ("Sanctions Motion").



23-60537.287

F.     The bankruptcy schedules filed by Cotton reflect that he has a potential bad faith claim against Allstate Insurance Company arising from a policy of automobile liability insurance in effect at the time of the motor vehicle accident involving Cotton and Caleb Crabtree ("Bad Faith Claim"). The Bad Faith Claim is property of Cotton's bankruptcy estate and the Trustee has sole authority to pursue or otherwise administer the Bad Faith Claim.

G.     Cotton and Crabtree have agreed to settle their disputes and, as a part of the settlement, the Trustee has agreed to assign the Bad Faith Claim to Crabtree or his designee, all on the terms contained herein.

NOW THEREFORE, for and in consideration of the mutual covenants contained herein, and other good and valuable consideration, the Parties hereby agree as follows:

1.     **Assignment of the Bad Faith Claim.** The Trustee will sell and assign the Bad Faith Claim to Crabtree's designee, Court Properties, Inc., P.O. Box 1, Picayune, MS 39466, for the sum of $10,000.00. The Assignment shall be "AS IS" with no representations or warranties whatsoever as to the validity or viability of the Bad Faith Claim. The form of the Assignment shall be substantially similar to Exhibit "A" attached hereto.

2.     **Cooperation by Cotton.** Cotton agrees to cooperate with Crabtree and/or his designee in the filing and prosecution of the Bad Faith Claim, including providing factual information, deposition and trial testimony reasonably requested by Crabtree and/or his designee or legal counsel to further the Bad Faith Claim.

3.     **Subordination of Crabtree's Claim.** Crabtree's unsecured claim in the Cotton Bankruptcy Case shall be subordinate to other allowed general unsecured claims as is permissible under Section 510(a) of the Bankruptcy Code. The subordination shall not be construed as a waiver of the claim and shall not affect the validity or amount of the claim in

23-60537.288

32

any manner. The validity and amount of the claim shall be determined by the Lamar County Circuit Court in the Negligence Lawsuit.

4. **Dismissal of Discharge Complaint.** The Parties shall execute and file with the Bankruptcy Court a Rule 7041 Stipulation of Dismissal substantially similar to Exhibit "B" attached hereto dismissing the Discharge Complaint.

5. **Exempt Property.** Crabtree shall cease any efforts to object to property exemptions claimed by Cotton, and the exemptions shall be allowed per Order on Objection to Exemptions (Dkt# 127). Additionally, the exemptions claimed by Cotton in the following property shall be allowed:

> A. Home at 74 Lamar Smith Rd., Poplarville, MS;
>
> B. 8 acres adjacent to home at 74 Lamar Smith Rd.;
>
> C. Mobile Home at 68 Lamar Smith Rd., Poplarville, MS 39470;
>
> D. Household: furniture, appliances;
>
> E. Electronics: laptop, 4 tvs, xbox one console, tablet;
>
> F. Firearms: 3 handguns and 1 rifle;
>
> G. Kubota Tractor 2020;
>
> H. Lawn Mower.

6. **Sanctions.** Cotton shall withdraw the Motion for Sanctions (Dkt # 154).

7. **Further Bankruptcy Court Filings.** Neither Crabtree nor anyone acting on behalf of Crabtree shall file any additional adversary proceedings, contested matters or objections in the Cotton Bankruptcy Case. The Parties agree that this is a full settlement and compromise of all matters currently pending before the Court or which could be brought before the Bankruptcy Court.

23-60537.289

33

8. **Advice of Counsel.** Each Party represents to the other that is has discussed this Agreement with his counsel and fully understands the terms hereof, and that he has not relied upon any representation or statement of the any other Party except as contained herein.

9. **Complete Agreement.** This Agreement contains the entire and final agreement between the Parties and there are no agreements, understandings, warranties or representations among the Parties except as contained herein. This is a fully integrated agreement. It may not be altered or modified by oral agreement or representation or otherwise except by a writing of subsequent date hereto signed by all parties in interest at the time of the alteration or modification.

10. **Representations and Warranties.** Subject to Section 12 below, each Party represents and warrants that it (A) has the power and authority to execute, deliver and perform this Agreement, and (B) the is Agreement is a valid and legally binding obligation of the Party, enforceable in accordance with its terms.

11. **Miscellaneous.** It is further agreed as follows:

(A) This Agreement will inure to the benefit of and bind the respective heirs, personal representatives, successors, and permitted assigns of the Parties;

(B) This Agreement will be construed in accordance with the laws of the State of Mississippi; and

(C) In the event of a breach of any representation or warranty in this Agreement and the non-breaching Party incurs attorney's fees and expenses on account of such breach, the non-breaching Party shall be entitled to recover such fees and expenses from the Party in breach.

23-60537.290

34

12. **Bankruptcy Court Approval Required.** This Agreement shall have no binding effect until it is approved by the Bankruptcy Court.

13. **Counterparts; Electronic Delivery.** This Agreement may be executed in multiple counterparts with the same effect as if all Parties had signed the same document. This Agreement may be transmitted and signed by electronic mail, and (.pdf) copies of manually-signed originals shall have the same effect as manually-signed originals and shall be binding on the Parties, their successor and assigns.

SO AGREED this the ___ day of _____, 2021.

PARTIES:                              APROVED BY COUNSEL:

_____               _____
CASEY JAMES COTTON                    MICHAEL RAMSEY


_____               _____
CALEB CRABTREE                        SAMUEL MCHARD


_____
ADRIANE CRABTREE


_____
KIMBERLY R. LENTZ, IN HER
CAPACITYAS CHAPTER 7 TRUSTEE

23-60537.291

35